### STATE OF CONNECTICUT *v.* MELVIN JONES
### (15130)

PETERS, C. J., and BORDEN, BERDON, KATZ and PALMER, Js.

Argued February 9—decision released July 18, 1995

*John R. Williams*, with whom was *Katrena Eng-strom*, for the appellant (defendant).

*Harry Weller*, assistant state's attorney, with whom were *James G. Clark*, assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, for the appellee (state).

KATZ, J. The principal issue on appeal is whether under the facts of this case, the defendant, charged with capital felony in violation of General Statutes § 53a-54b (3), was entitled to be tried in a bifurcated proceeding. We hold that he was so entitled and reverse the judgment of conviction.

The jury reasonably could have found the following facts. At approximately 7 a.m. on October 17, 1990, Bonaventura Console, a facility supervisor for the city of New Haven who lived on Howard Avenue, saw the defendant walking toward an automobile parked across the street from Console's home. A white male, later identified as Wayne Curtis (victim), was seated in the front seat of the vehicle. Console had frequently seen the defendant in that neighborhood and later that same day described him to the police as a black male with braided hair who always wore camouflage clothing. Moments later, a young girl named Nilda Mercado passed the victim's vehicle on her way to school. Mercado witnessed a black male standing outside the car banging the head of a white man who was seated in the vehicle against the car door. As she drew closer, Mercado saw the black male fire two shots at the white male. Immediately after the incident, she described the shooter to her aunt as having four braids in his hair and as wearing camouflage clothing. Although Mercado was unable to identify the defendant from an array of 600 photographs, her aunt immediately recognized the defendant from Mercado's description.

Angel Delgado, a seventeen year old boy who also lived on Howard Avenue, was looking out a second story window of his home at approximately 7:15 a.m.

on October 17, 1990, when he witnessed the defendant and the victim across the street. The victim was seated inside a vehicle and the two men were arguing. Although Delgado saw only the back of the defendant and his view may have been somewhat obscured by a tree,[1] he recognized the defendant as someone he frequently had seen around that neighborhood during the weeks preceding the crime. Delgado looked away for a moment and then heard gunshots. When he looked back, the defendant was gone and the victim was lying back in the driver's seat. Delgado saw Mercado run quickly past the vehicle immediately after the shooting. He also described the defendant as sporting four braids and wearing camouflage clothing.

Two other witnesses tied the defendant to the crime. Frankie Harris, who also knew the defendant from that neighborhood, heard the shots and moments later saw the defendant run toward her, remove a camouflage jacket and throw it in a nearby dumpster.[2] She retrieved the jacket, which contained a work order from a service station for a wheel alignment performed on the victim's car. Harris admitted to being a drug addict and having been a police informant, although she testified that at the time of the murder, she had not consumed drugs for eight months and that, at the time she spoke to the police, she had been told that she would not be paid for her information in connection with this case.

---

[1] Although in his statement to the police, which was introduced into evidence as a prior inconsistent statement, Delgado had stated that his vision was obstructed by "the branches from the tree," he testified in court that nothing obstructed his vision, that "[i]t was the clear vision. I could see a clear vision. There was bushes in the way, but I could see the car and [the defendant and the victim] talking."

[2] Harris also testified on direct examination that she had initially intentionally misidentified two people as resembling the person she had seen discard the camouflage jacket. She explained that she did so out of fear of the defendant, whom her boyfriend had told her was "no joke . . . a killer" who had served time with him in Somers prison.

Larry Hodge, also a narcotics abuser and police informant, first met the victim at a gas station on Route 80 in New Haven at 3 a.m. on October 17, 1990. Hodge paid the victim for a ride to Anastasio's truck stop. Both men were high on drugs and the victim was searching for more cocaine. After Hodge exited the vehicle and began to walk away, he noticed a black man with braided hair approach the victim and then get into the vehicle. After learning of the victim's death, Hodge, out of concern that his fingerprints in the automobile would be identified in the homicide investigation, contacted the police. In his interview with the police, Hodge gave a sworn statement identifying the defendant from a photographic array as the man he had seen get into the victim's car. Hodge later retracted that identification before the jury. There was evidence that this retraction was due to fear of retaliation by people who had pressured him not to testify in the trial.

Officer Brendan Cannon of the New Haven police department arrested the defendant on October 19, 1990. At the time of his arrest, the defendant had his hair in four braids and was wearing a camouflage jacket that was labeled "extra small, regular" in size. As the state argued, the jury could reasonably determine, from viewing the defendant's body type, that the jacket was too small for him.[3]

Arkady Katsnelson, the assistant state medical examiner, testified that the victim had died from loss of blood as a result of being shot in the abdomen and that he had suffered facial bruises consistent with having had his head slammed into the armrest of the door. A second bullet was recovered from the driver's side door. Residue located on the left side of the victim's pants indicated that the shooter had been positioned on the vic-

---

[3] This jacket was not introduced into evidence because the state had lost it. The court, however, instructed the jury that it could draw a permissive adverse inference against the state as a result of that loss.

tim's left side. Both the jacket that Harris saw the defendant throw into the dumpster and the jacket that the defendant was wearing at the time of his arrest tested negative for blood and gunshot residue. The victim's automobile was dusted for fingerprints, and while many were lifted, the defendant's fingerprints were not found. Although the state recovered several negroid hairs from the interior of the victim's automobile, the comparison tests by the state forensic laboratory using hair samples taken from the defendant were negative. Additional tests using blood samples taken from the defendant also failed to link him to the crime.

The defendant admitted that he wore camouflage clothing almost all of the time and that he had four braids in his hair. Moreover, the jury could have inferred, from the position of the victim's body in the car, the wounds on the victim's head and the trajectory of the bullets, that the assailant was left handed. The court took notice that, during the trial, the defendant had written with his left hand "innumerable times . . . in the presence of the jury."

The jury convicted the defendant of capital felony in violation of § 53a-54b (3)[4] and carrying a pistol with-

---

[4] General.Statutes § 53a-54b provides: "CAPITAL FELONY. A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the division of state police within the department of public safety or of any local police department, a chief inspector or inspector in the division of criminal justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or any fireman, while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kid-

out a permit in violation of General Statutes § 29-35.[5] The defendant was sentenced to life imprisonment without the possibility of parole. A timely appeal was

napper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for economic gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone; (7) murder committed in the course of the commission of sexual assault in the first degree; (8) murder of two or more persons at the same time or in the course of a single transaction."

[5] General Statutes § 29-35 provides: "CARRYING OF PISTOL OR REVOLVER WITHOUT PERMIT PROHIBITED. EXCEPTIONS. (a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States, or to any person carrying a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person carrying an antique pistol or revolver, as defined in section 29-33.

"(b) The holder of a permit issued pursuant to section 29-28 shall carry such permit on his person while carrying such pistol or revolver."

A third count of the information charging the defendant with criminal use of a pistol in violation of General Statutes § 53a-217 had been severed at an earlier stage of the proceedings.

filed with this court. The defendant raises four issues on appeal. He claims that: (1) there was insufficient evidence upon which to convict him of capital felony in violation of § 53a-54b (3); (2) the trial court should have bifurcated the trial on the charge of capital felony; (3) the trial court should not have instructed the jury that it could consider his lack of cooperation regarding the court-ordered taking of nontestimonial evidence; and (4) the denial of food and access to research facilities during the trial interfered with his right to effective assistance of counsel. We disagree with the defendant on his first claim, agree with him on his second and third claims and do not decide his fourth claim. Accordingly, we reverse the judgment and order a new trial. Additional facts will be set forth where pertinent.

I

"When an appeal challenges the sufficiency of the evidence to justify a verdict of guilty, we have a two-fold task. We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the verdict. *State* v. *Cimino*, 194 Conn. 210, 211, 478 A.2d 1005 (1984); *State* v. *Ferrell*, 191 Conn. 37, 46, 463 A.2d 573 (1983). We then determine whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. *State* v. *Stepney*, 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984); *State* v. *Duhan*, 194 Conn. 347, 355, 481 A.2d 48 (1984). *State* v. *Braxton*, 196 Conn. 685, 691, 495 A.2d 273 (1985); *State* v. *Rollinson*, 203 Conn. 641, 665–66, 526 A.2d 1283 (1987); *State* v. *Arnold*, 201 Conn. 276, 282, 514 A.2d 330 (1986). In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or

in part, of evidence that is circumstantial rather than direct. *State* v. *Sinclair*, 197 Conn. 574, 576, 500 A.2d 539 (1985), and cases there cited. *State* v. *Rollinson*, supra, 666." (Internal quotation marks omitted.) *State* v. *Carpenter*, 214 Conn. 77, 78–79, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992).

It bears emphasis that the scope of our factual inquiry on appeal is limited. "We do not sit as a thirteenth juror who may cast a vote against the verdict based on our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *Henning*, 220 Conn. 417, 420, 599 A.2d 1065 (1991). "This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Hart*, 198 Conn. 424, 427, 503 A.2d 588 (1986).

Although the evidence, consisting almost exclusively of identification testimony, was not overwhelming, it was nevertheless sufficient. Although Hodge later retracted his positive identification of the defendant, we cannot conclude that no rational juror could have credited this positive identification of the defendant, given to the police shortly after the incident, as the person whom he had seen get into the victim's automobile in the early morning hours of October 17, 1990. Inconsistencies do not render a witness' testimony incredible as a matter of law. *State* v. *White*, 229 Conn. 125, 143–44, 640 A.2d 572 (1994); *State* v. *Anonymous (83-FG)*, 190 Conn. 715, 722, 463 A.2d 533 (1983).

"It is uniquely the province of the trier of fact, in this case the jury, to determine the import of the evidence

by gauging the credibility of the witnesses. *State* v. *Stepney,* [supra, 191 Conn. 255]; *Kaplan* v. *Kaplan,* 186 Conn. 387, 391, 441 A.2d 629 (1982). The fact that certain testimony is uncorroborated, *or even contradicted,* does not make it insufficient to support a verdict if the testimony is believed by the trier. See *Garrison* v. *Garrison,* 190 Conn. 173, 179, 460 A.2d 945 (1983)." (Emphasis added.) *Berry* v. *Loiseau,* 223 Conn. 786, 821, 614 A.2d 414 (1992). The jury was best able to observe Hodge's conduct in court and assess whether his recantation was sincere or the result of fear.

Similarly, the jury was in the best position to decide whether Harris was testifying truthfully about seeing the defendant discard the coat that was later tied to the victim. That she was a drug addict and police informant were facts brought to the attention of the jurors, who also heard testimony about the effects of drug addiction on a person's ability to perceive events around her. Finally, the jury was also free to accept or reject the identification of the defendant by Delgado who, while looking out his second story window across the street from the scene, saw only the back of the defendant's head. In making his identification, Delgado relied on his recollection of the defendant's braided hair and camouflage clothing, a description provided by some of the state's other identification witnesses. Whether these characteristics are sufficiently distinct trademarks is an inquiry that falls uniquely within the jury's province as fact finders.

In short, we do not sit as an added juror because "[w]e have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." (Internal quotation marks omitted.) *State* v. *Rodriquez,* 200 Conn. 685, 693, 513 A.2d 71 (1986). Under these circumstances, even in the absence of forensic evidence, we cannot usurp the role of the jury and discredit the testimony of the

state's witnesses as a matter of law. See *Berry* v. *Loiseau*, supra, 223 Conn. 821. We conclude, therefore, that the state produced sufficient evidence upon which, if credited, the jury reasonably could have concluded beyond a reasonable doubt that the defendant had committed a capital felony in violation of § 53a-54b (3).

## II

The second issue is whether, to ensure a fair trial, the trial court should have bifurcated the charge of capital felony. Specifically, the defendant claims that the jury first should have heard the evidence that related to the intentional murder of the victim as that crime is defined by General Statutes § 53a-54a. He argues that if he had been convicted of intentional murder, he then could have stood trial before the same jury for it to decide whether he previously had been convicted of felony murder and therefore was guilty of capital felony. Under the specific circumstances of this case, we agree.

The following additional facts are undisputed. Prior to the commencement of evidence, the defendant, who had waived his right to counsel earlier in the pretrial proceedings, filed a motion in limine requesting bifurcation of the capital felony count of the information to preclude admission of his prior murder conviction until after the jury first determined whether he had murdered the victim.[6] In his motion, he described the type of

---

[6] We note that the trial court informed each of the eight venire panels, from which the jury was selected on various dates from June 29, 1992, to July 10, 1992, that the case involved an allegation that the defendant had previously been convicted of intentional murder. Consequently, the defendant asked venirepersons, two of whom ultimately served on his jury, whether his prior conviction would have any effect on their decision. The next day, after three jurors had already been selected, the defendant asked the trial court to restrict its comments concerning the accusation of the prior intentional murder conviction. The trial court denied the request and told the defendant that it wanted to be sure that the jurors understood that the alleged prior murder conviction was not directly connected to the facts of

prejudice that would occur were the jury to hear of his

this case. The following day, after a total of five jurors had been selected, the defendant alerted the court that he had asked his standby counsel to prepare "a motion to eliminate any reference . . . to my prior conviction. And a motion to amend the information in the first count." The court responded that "[t]here is no objective, no point in anybody filing a motion to delete from the first count and for your assistance the third count. The allegation of a prior conviction of anything, that those are elements of the offenses charged in the first and third counts. Therefore, there is no point in preparing a document to submit here because it's not going to be granted. What else, if you want to construe that as an oral motion to amend the first and third counts to delete the reference to the prior conviction, the motion is denied. As it would be denied if a formal motion was filed by counsel."

That same day, the defendant also filed a motion for continuance in which he asked the court to sever from the other two counts the third count of the information alleging that on October 20, 1990, the defendant, who had previously been convicted of a class A felony, possessed a pistol in violation of General Statutes § 53a-217. Expressing concern that four or five jurors had already been selected, the trial court nevertheless took the matter under advisement, continued with voir dire, heard argument the following day in connection with the motion, and, on July 7, 1992, granted the motion to sever the third count. On July 8, 1992, the defendant filed a series of motions, including a motion in limine, which the trial court understood to be a renewed request to omit any reference to the allegation of the defendant's prior murder conviction. Following the denial of those motions, voir dire continued.

The state does not argue that the defendant waived his claim for bifurcation as a result of anything that transpired during the voir dire. A waiver claim would be difficult to sustain in light of the fact that the defendant first began his protestation to the inclusion of the prior murder conviction early in the jury selection. If the trial court had acted favorably toward the defendant's request, there was then an opportunity, with little inconvenience, to strike those jurors who had already been selected, if that were deemed necessary.

Additionally, we note that the state does not argue that the timing of the defendant's motions should predetermine their outcome. The fact that five jurors had already been chosen when the defendant first raised his request for severance did not dissuade the trial court from granting that request. This record demonstrates that the trial court itself concluded that matters that raise claims of significant prejudice should be addressed whenever they are brought to its attention. Obviously, in that instance, the trial court determined that the prejudice to the defendant outweighed the inconvenience to the state in having to try the defendant separately on the third count. The trial court's decision, after granting the motion to sever, not

prior conviction before deciding whether he had intentionally murdered the victim.[7]

to discharge the jurors already selected might have been premised on the difference between voir dire and evidence. Voir dire is intended to allow the parties to explore areas of disqualification. *State* v. *Dolphin*, 203 Conn. 506, 512, 525 A.2d 509 (1987). Although those jurors had heard about the third count, the trial court apparently felt confident that any concerns of bias would be eliminated by the standard instructions to decide the case based solely on the evidence of guilt that the state proved. Jurors are routinely instructed that certain matters, such as statements, questions, objections and argument of counsel, and the information alleging the offenses with which the defendant stands charged, are not evidence of guilt. See A. Ment & R. Fraccasse, A Collection of Connecticut Selected Jury Instructions Criminal (3d Ed. 1995) §§ 1.2, 2.3. Furthermore, such instructions are reinforced at various stages of the trial proceedings. Id. The defendant has not challenged the trial court's ruling with respect to the jurors who heard his case.

Finally, we note that the state does not argue that, because the defendant questioned several prospective jurors, two of whom were ultimately selected, about the allegation of his prior murder conviction, he cannot now pursue his claim of prejudice at trial. Again, this also may stem from recognition that voir dire is not evidence. The state does not claim that the voir dire eliminated any risk of prejudice or constituted an election by the defendant to introject the issue without regard to prejudice. Rather, the state argues that although the defendant was prejudiced by the introduction into evidence of the prior murder conviction, that prejudice was not "unfair" because the evidence was necessary to prove an element of the crime charged, an argument we reject. See the text of part II of this opinion.

[7] The defendant argued in his motion that if he were "convicted of murdering [the victim] in October, 1990, then the court may try the element of CAPITAL FELONY relating to the 1974 prior incident and conviction immediately thereafter." Acting pro se throughout the pretrial proceedings and the trial, the defendant relied on *State* v. *Nardini*, 187 Conn. 513, 447 A.2d 396 (1982), as well as other decisions of this court addressing the balancing of prejudice versus probative value that must be conducted whenever the state seeks to use a felony conviction for impeachment purposes, and on *State* v. *Sierra*, 213 Conn. 422, 568 A.2d 448 (1990), for its discussion of this same balancing test that must be conducted whenever the state seeks to introduce misconduct evidence. Although these cases are not entirely on point because the defendant's prior conviction is an essential element of § 53a-54b (3) and is thus obviously probative, we are nevertheless guided by the discussion in those cases of prejudice and how it is assessed. The state, therefore, does not suggest that the defendant's motion in limine failed to alert the court to his claim that he would be unduly prejudiced if the issue of whether he had been previously convicted of murder were tried together with the issue of whether he murdered the victim.

The trial court denied the motion. At trial, the state presented the evidence of the defendant's prior conviction through Jack Dziekan, the criminal clerk for the judicial district of New Haven. In addition to the fingerprint cards taken of the defendant in 1975 and in 1990, the judgment file and the mittimus were placed into evidence to prove that in 1976, the defendant had been convicted of felony murder and committed to the commissioner of correction for a period of not less than eighteen years nor more than life. No testimony was offered regarding the details of that earlier homicide.

On appeal, the defendant argues that his prior murder conviction makes this case like *State* v. *Ferrone*, 96 Conn. 160, 172–76, 113 A. 452 (1921), in which we held that when an information includes a defendant's history of prior convictions as a basis for increasing a sentence, in order to avoid the possibility of prejudice, the jury that hears the allegations concerning the current charge cannot be made aware of those prior convictions until after it has first decided the issue of guilt as to the current charge. We devised this procedure in *Ferrone*, because the allegations of prior convictions were separate from the specific substantive crime and were such that conviction could have been obtained simply upon proof of the defendant's status as a person who previously had been convicted of the applicable offense. We reasoned that because the prior conviction, although an element of the crime charged, is the only fact that must be proven beyond a reasonable doubt in addition to the current substantive crime, separating the allegation of the prior conviction does not harm the state and best protects the defendant from unnecessary prejudice. In the absence of any compelling reason to subject the defendant to this prejudice, we devised the rule that if proof of a defendant's prior conviction is used to enhance the punishment for a contemporaneous conviction of a substantive offense, the

state must file a two part information. Practice Book § 619;[8] see Practice Book § 840.[9] This procedure is used when the state charges a defendant as a persistent offender. See General Statutes § 53a-40 (a) through (i). The defendant argues that because § 53a-54b (3) "is in the nature of a persistent offender allegation," the trial court should have granted his motion to bifurcate.

The state argues that because the prior murder is an element of § 53a-54b (3), and not merely a sentence enhancer, it must be tried together with the other elements of capital felony. The state makes three arguments in support of the trial court's ruling.

First, the state directs our attention to *State* v. *Banta*, 15 Conn. App. 161, 544 A.2d 1226, cert. denied, 209 Conn. 815, 550 A.2d 1086 (1988), in which the defendant argued that because he had been charged with possession of a firearm by a person convicted of a felony under General Statutes § 53a-217, the bifurcation procedure should have been used. The Appellate Court denied the defendant's claim. That court recognized that the "rules of practice require a two part informa-

---

[8] Practice Book § 619 provides: "Where the information alleges, in addition to the principal offense charged, a former conviction or convictions, such information shall be in two separate parts, each signed by the prosecuting authority. In the first part, the particular offense with which the accused is charged shall be set out, and in the other part the former conviction or convictions shall be alleged. In alleging the former conviction, it is sufficient that the information allege the date when, the town or city where, and the court wherein such conviction was obtained and the crime of which the defendant was convicted, all of which may be stated in accordance with the provisions of Sec. 618."

[9] Practice Book § 840 provides: "[JURY TRIALS]——TWO-PART INFORMATION OR INDICTMENT

"When an information or indictment is divided into two parts under Sec. 619, on a finding of guilty on the first part of the information or indictment, a plea shall be taken and, if necessary, election made on the second part and the trial thereon proceeded with. If the defendant elects a jury trial on the second part of the information or indictment, such trial may be had to the same or to another jury as the judicial authority may direct."

tion and trial when proof of a defendant's prior conviction is used to enhance the punishment for a contemporaneous conviction of a substantive offense," but held that these rules did not apply to a charge brought under § 53a-217. Id., 173. That court reasoned that the rule of *State* v. *Ferrone,* supra, 96 Conn. 160, now incorporated in our rules of practice, "applies only to persistent offender or recidivist charges. See General Statutes § 53a-40. It applies to allegations of prior convictions that cannot be brought separately from an information charging a specific substantive crime; *State* v. *Lewis,* 176 Conn. 270, 272–73, 407 A.2d 955 (1978) . . . ." *State* v. *Banta,* supra, 174. The Appellate Court reasoned that there is no need to use a two part information to charge a violation of § 53a-217 because "in setting out the principal offense, the first part of the information would, of necessity, include mention of the defendant's prior felony conviction which forms a part of that charge . . . [as] an information [to be provided to the jury] alleging only that a defendant possessed a handgun, without mention of his prior conviction, would fail to allege any cognizable offense under our penal code." Id.

This case presents a scenario very different from that of *Banta.* In this case, an information that alleged only that the defendant had intentionally murdered the victim, without mention of the defendant's prior conviction, *would* allege a cognizable offense, namely, murder in violation of § 53a-54a. We agree that the structure of the capital felony statute, like that of the statute at issue in *Banta,* makes the former conviction an essential element of the crime charged. Compare General Statutes §§ 53a-54b (3) and 53a-40. The purpose of § 53a-54b (3), however, unlike the statute at issue in *Banta,* is not to define a new type of crime, but rather to enhance the sentence for an activity that is already classified as a crime. By designating the defendant's

prior felony conviction as an "element" of the crime of capital felony, the legislature has made the defendant eligible for the sentence not just of life in prison, but of death. Thus, the statute is much more analogous to the persistent offender statutes we discussed in *State* v. *Ferrone*, supra, 96 Conn. 172–76, than to the crime of possession of a handgun by a felon discussed in *Banta*.

In its second argument, the state argues that the legislature, in defining the crime of capital felony and including the prior murder as an essential element, articulated its intent that all the elements be tried together in one proceeding. We disagree that the statute, as drafted, unambiguously manifests the legislature's intent to prohibit bifurcation where the interests of justice require it. "Criminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. See *Rewis* v. *United States*, 401 U.S. 808, 812, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971); *Bell* v. *United States*, 349 U.S. 81, 83, 75 S. Ct. 620, 99 L. Ed. 905 (1955); *State* v. *Rawls*, 198 Conn. 111, 121, 502 A.2d 374 (1985); *State* v. *Dupree*, 196 Conn. 655, 660, 495 A.2d 691 [cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301] (1985). These considerations are especially pertinent to a death penalty statute such as § 53a-54b." *State* v. *McGann*, 199 Conn. 163, 177, 506 A.2d 109 (1986). As noted above, it appears to us much more likely that the legislature did not consider the effects of the statute's structure on trial procedure and that it defined the prior murder conviction as an element of the crime not because it was creating a new type of crime, but rather to increase the penalty that could be imposed on murder when committed by someone with a previous murder conviction.

Other subdivisions of § 53a-54b classify certain murders as capital felonies because they are more atro-

cious types of murder. Murder during a kidnapping (subdivision [5]), or sexual assault (subdivision [7]), murder of a peace officer (subdivision [1]), murder of two or more people (subdivision [8]), murder for pecuniary gain (subdivision [2]), and murder of a person following ingestion of drugs provided for profit by the defendant (subdivision [6]) are all more heinous than murder by a previous murderer. Subdivision (3) is classified as capital felony for the same reason we have previous offender statutes—to increase the sentence as a deterrent to recidivism. The prior murder conviction, although an element of subdivision (3), is not otherwise related to the current murder. The "element" which makes subdivision (3) capital murder is, therefore, not of the same nature as, for example, kidnapping is an element of subdivision (5), or sexual assault is an element of subdivision (7). Logic tells us that subdivision (3) is incorporated into § 53a-54b as a matter of convenience so that all capital crimes can be located in one place and that the legislature had no other agenda.[10]

The state's last argument is that this court's decision in *State* v. *Ross*, 230 Conn. 183, 194–202, 646 A.2d 1318 (1994), controls this issue and prohibits bifurcation of a charge under § 53a-54b (3). We disagree with the state's reading of *Ross*. In that case, the defendant argued that Connecticut did not have jurisdiction over the capital felony of "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety," in violation of § 53a-54b (5), because, although the kidnapping had taken place in Connecticut, he had murdered the victim in Rhode Island. The defendant "emphasize[d] that the statute punishes an aggravated form of murder, so that the gravamen of the offense charged is the homicide that

---

[10] We do not decide whether a violation of subdivision (4) of § 53a-54b serves any purpose other than as a sentence enhancer.

occurred [outside Connecticut]. The state argue[d], to the contrary, that the statute prescribes a linkage between kidnapping and murder that allows the exercise of territorial jurisdiction over the consequences of a kidnapping that began in Connecticut." Id., 195. We concluded, as a matter of statutory construction, that the statute requires the state to prove a murder by a kidnapper, but does not dictate that the murder must have been committed in Connecticut. Additionally, we held that § 53a-54b (5) speaks of " 'murder by a kidnapper' and does not prioritize between the commission of the two predicate felonies, kidnapping and murder." Id., 201.

The decision in *Ross* does not control the issue at hand because subdivision (5) of the capital felony statute defines an offense that has elements that are directly related to one another. The use of the phrase "during the course of" requires the state to show a temporal connection between the murder and the kidnapping; *State* v. *Young*, 191 Conn. 636, 656, 469 A.2d 1189 (1983) (*Peters, J.*, dissenting); as does the phrase "before such person is able to return or be returned to safety." General Statutes § 53a-54b (5). In its prosecution of the defendant under § 53a-54b (5) in *Ross*, the state therefore was required to provide evidence that the murder and kidnapping were connected. There was no requirement in this case for the state to prove that the defendant's 1976 murder conviction was connected, in any way, to the murder of the victim.[11]

---

[11] We note that § 53a-54b (7) and (8) contain the same temporal requirement as in subdivision (5). In subdivisions (1), (2) and (6), of the capital felony statute, the essential elements are directly related to each other. Bifurcation of components within any one of these other subdivisions would therefore likely place an undue and unnecessary burden on the prosecution. We do not decide whether the same bifurcation procedure we recommend in this case should be considered by the trial court when a defendant has been charged with a violation of subdivision (4) of the capital felony statute.

Viewing § 53a-54b (3) in its entirety, we are persuaded that its provisions more closely resemble those at issue in *State* v. *Ferrone*, supra, 96 Conn. 160, than those at issue in *State* v. *Banta*, supra, 15 Conn. App. 161. This conclusion is buttressed by our decisions in related cases involving considerations of undue prejudice in the law of severance and joinder.

"A judicial authority may order that two or more indictments or informations or both, whether against the same defendant or different defendants, be tried together. Practice Book § 829; General Statutes § 54-57. A judicial authority may also order separate trials if it appears that a defendant is prejudiced by joinder. Practice Book § 828. This does not mean that severance is to be had for the asking. *State* v. *King*, 187 Conn. 292, 302, 445 A.2d 901 (1982); see also *State* v. *Bell*, 188 Conn. 406, 410–11, 450 A.2d 356 (1982) [superseded by statute on other grounds as stated in *West Haven Sound Development Corp.* v. *West Haven*, 207 Conn. 308, 541 A.2d 858 (1988)].

"The question of severance lies within the discretion of the trial court. We will not disturb the trial court's conclusion on the issue absent a clear abuse of discretion. The discretion to sever a trial should be exercised only if a joint trial will substantially prejudice the defendant. Substantial prejudice is more than disadvantage and the formidable task of demonstrating an abuse of discretion and that a joint trial resulted in substantial prejudice falls to the defendant. *State* v. *Smith*, 201 Conn. 659, 669, 519 A.2d 26 (1986); *State* v. *Schroff*, 198 Conn. 405, 408, 503 A.2d 167 (1986); *State* v. *Rodgers*, 198 Conn. 53, 63, 502 A.2d 360 (1985); *State* v. *Wiggins*, 7 Conn. App. 95, 101, 507 A.2d 518 (1986). Simply put, the test to be applied is whether substantial injustice will result if the charges are tried together. *State* v. *King*, supra, [187 Conn.] 299; *State* v. *Oliver*, 161 Conn. 348, 360–61, 288 A.2d 81 (1971) [overruled

on other grounds as stated in *State* v. *Ledbetter*, 185 Conn. 607, 441 A.2d 595 (1981)]." *State* v. *Edwards*, 10 Conn. App. 503, 506–507, 524 A.2d 648, cert. denied, 204 Conn. 808, 528 A.2d 1155 (1987); see *State* v. *Horne*, 215 Conn. 538, 547, 577 A.2d 694 (1990); *State* v. *Herring*, 210 Conn. 78, 95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989); *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987); *State* v. *Boscarino*, 204 Conn. 714, 721–25, 529 A.2d 1260 (1987).

It is clear then that the presumption is in favor of joinder and against severance. Only when joinder will work a substantial injustice should a trial court sever the charges. *State* v. *Boscarino*, supra, 204 Conn. 721. The rationale underlying this standard should apply to a request to bifurcate where, as in *Ferrone*, and in the facts at issue here, the element to be tried separately rests solely upon proof of the defendant's status as a person who earlier had been convicted of murder. Applying this same criterion, we turn to the question of whether the lack of bifurcation created a risk of unnecessary prejudice sufficient to require a new trial.

The state argues that although evidence of the prior homicide was prejudicial, such prejudice, nevertheless, was considered permissible by the legislature when it defined the crime. In responding to questions at oral argument about whether the defendant was prejudiced by the evidence, the state responded that the prejudice was legitimate because the prior conviction was an element of the capital felony with which he was charged. We have already rejected the state's argument that the statute *requires* that only one trial be conducted. Therefore, we also must reject the contention that the legislature has "authorized" substantial prejudice. In demanding that a trial court use a balancing test to decide whether to admit against a defendant misconduct evidence or evidence of a prior conviction for

impeachment purposes, we have acknowledged that the prejudice generated by admission of such evidence is high. See *State* v. *Nardini*, 187 Conn. 513, 522, 447 A.2d 396 (1982). We also have recognized that the probability of a jury inferring a predisposition to commit the crime with which the defendant stands charged is logically increased when the evidence pertains to misconduct similar to that involved in the case on trial because such evidence creates "inevitable pressure on lay jurors to believe that if he did it before he probably did so this time." (Internal quotation marks omitted.) *State* v. *Geyer*, 194 Conn. 1, 15, 480 A.2d 489 (1984); see *State* v. *Carter*, 189 Conn. 631, 642, 458 A.2d 379 (1983).

It is beyond dispute that in this case the jury was subjected to facts and considerations having no legitimate bearing on the actual murder at issue. Furthermore, the risk that the defendant was prejudiced is manifest. That the jury was unaware of the specifics of the prior homicide could not detract from the reasonable conclusion that the defendant was predisposed to kill. According to the mittimus, the defendant was sentenced in 1976 to a minimum of eighteen years and a maximum of lifetime incarceration. From this the jurors learned that the defendant was a murderer, that he had already spent much of his life in prison prior to his arrest for yet another homicide, and that another court had already determined that incarceration or its threat should hang over the defendant's head for the rest of his natural life.[12]

---

[12] The dissent cites to testimony by Harris that she initially intentionally misidentified two people as resembling the person she had seen discard the camouflage jacket because she feared the defendant whom her boyfriend had told her was "no joke . . . a killer" who had served time with him in Somers prison. The dissent considers this testimony, that was introduced to explain her state of mind and that provides absolutely no substantive proof of guilt, to be "the functional equivalent" of the substantive evidence contained in the mittimus. We disagree. Even the state does not point to this evidence or argue that its admission makes the evidence of the prior conviction harmless.

Moreover, the risk of such substantial prejudice is not outweighed by the state's interest in judicial economy. Little time is saved in a case such as this where the evidence of the prior conviction is pro forma and the conviction serves so limited a purpose. Conservation of judicial resources is insufficient justification to deny the defendant's request to bifurcate the trial where having the jury determine the truth of the prior murder conviction allegation concurrently with the currently charged murder poses a risk of substantial prejudice to the defendant.

Despite this risk, we recognize the highly unusual nature of the defendant's motion. We do not demand or necessarily expect our trial courts to create new roads of practice and procedure never before traveled in our jurisdiction. Furthermore, we recognize that, in the ordinary case, both the balancing of relevance and prejudice and the determination of joinder or bifurcation are committed to the sound exercise of discretion by the trial court. If this were an ordinary case, we would find no abuse of discretion by the trial court's rulings in this case. Because of the high risk of prejudice to the defendant on the present record and the absence of any prejudice to the state, combined with the extraordinary care required in appellate scrutiny of a capital felony conviction, we conclude, however, that the risk that the defendant failed to receive a fair trial is so substantial that we will exercise our supervisory powers to order a new bifurcated trial for this defendant.

"As an appellate court, we possess an inherent supervisory authority over the administration of justice. *Pinsky* v. *Statewide Grievance Committee*, 216 Conn. 228, 232, 578 A.2d 1075 (1990); *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State* v. *Ross*, 208 Conn. 156, 158–59, 543 A.2d 284 (1988);

*State* v. *Madera*, 198 Conn. 92, 99, 503 A.2d 136 (1985); *State* v. *Ubaldi*, 190 Conn. 559, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). The standards that we set under this supervisory authority 'are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as "due process of law" . . . .' *McNabb* v. *United States*, 318 U.S. 332, 340, 63 S. Ct. 608, 87 L. Ed. 819 (1942). Rather, the standards are flexible and are to be determined 'in the interests of justice.' *State* v. *Ross*, supra, 159." *State* v. *Patterson*, 230 Conn. 385, 397–98, 645 A.2d 535 (1994). In light of the foregoing discussion, we consider this case to warrant our exercise of supervisory authority.

At the same time, we must caution that our decision in this case does not require bifurcation in all cases involving a defendant charged with a violation of § 53a-54b (3). Without a doubt, having a jury determine the truth of a prior conviction allegation at the same time that it determines the truth of the current murder allegation poses a substantial risk of prejudice. There may be cases, however, in which the state can demonstrate a need to avoid a bifurcated trial. For example, if the state seeks to introduce the earlier conviction as evidence of a signature crime to prove identity; see *State* v. *Pollitt*, supra, 205 Conn. 71–72; the trial court should assess whether the evidence would otherwise be admissible using the same criteria generally employed by trial courts deciding whether to allow evidence of uncharged misconduct. See *State* v. *Baldwin*, 224 Conn. 347, 354–57, 618 A.2d 513 (1993). If the court determines that evidence of the prior murder is probative of such things as identity, intent, or an element of the crime, then the state should be permitted to introduce the prior murder and bifurcation should be denied.[13]

[13] Evidence of the prior murder as a signature crime is one, but not necessarily the only, situation in which the state will be able to meet its burden.

In this case, however, it is undisputed that the state did not offer any evidence of the conduct underlying the 1976 homicide conviction or indicate that the evidence of the prior murder conviction would be admissible for some other purpose. When asked at oral argument how it would be prejudiced by bifurcation, the state said only that bifurcation would "change the dynamic" of the proceeding. The state did not argue that the prior murder was a signature crime and that the evidence of that murder was admissible to show the commission of this murder. The only means by which "the dynamic" of the proceeding could have been changed, therefore, is that the state would not have been able to use the evidence of the prior murder to create the impression in the jurors' minds that this defendant was predisposed to kill. This is not a change to "the dynamic" of the trial, but rather is wholly consistent with the evidentiary rule that prior misconduct evidence is not admissible to inflame the jury's passion.[14] Although bifurcation undoubtedly makes the state's case more difficult, we are not inclined to allow the state to introduce prejudicial evidence in the absence of good reason to do so.

There may be other situations in which a bifurcated trial is not necessary. It will, however, be the state's burden to establish a need to avoid one.

The dissent suggests that the state will be prejudiced by bifurcation because it will be unable to introduce the evidence that Harris intentionally had misidentified the defendant because her boyfriend had told her the defendant previously had committed murder. This is not the type of prejudice to the state that should deter bifurcation. The type of prejudice to the state to which we refer is presented when the evidence of the prior murder is necessary to prove the identity of the killer.

[14] We note a cautionary instruction by the trial court limiting the permissible use of this evidence was provided in this case. The trial court instructed the jury as follows: "Ladies and gentlemen . . . I wanted to indicate to you at this time the purpose for which that evidence that you just heard . . . and the exhibits which I don't think you've seen as yet, but you will eventually . . . the purpose for which they were offered. Now, you will recall that just before we started the evidence yesterday morning I explained in very brief summation what the crime of capital felony means

Consequently, in each future instance in which a defendant is charged under § 53a-54b (3), if the state fails to demonstrate a need to avoid a bifurcated trial, the trial court should require a bifurcated proceeding. The defendant should first be tried for the current murder. In the event that the jury finds the defendant guilty, the same jury could then hear the evidence that the defendant had a prior conviction for murder. Such bifurcation will allow the jury to decide the current murder charge without being unnecessarily prejudiced and without the need for two separate trials.[15] This procedure strikes an appropriate balance between the con-

and I told you that capital felony is the crime that is charged when it is the . . . underlying claim of the state that the defendant with intent to cause the death of another person caused the death in this case of Wayne Curtis . . . and then I told you an additional element in connection with that charge is that in an unrelated case the defendant had previously been convicted of . . . murder. The evidence you just heard was evidence offered by the State in an effort to prove that last element I mentioned, that the defendant had previously been convicted of . . . murder, that was the purpose for which that evidence was offered, solely to prove that it did happen. That is the claim of the state. I want to stress that that evidence isn't to be considered by the jury along the lines of, well, if he did it once he did it again. That is not the purpose for which that evidence is offered. It isn't to be considered by you in that light. It is to be considered by you solely as evidence offered by the State in an effort to prove that this defendant was convicted, previously convicted of . . . murder according to the offer sometime in 1976. Now, that is the sole purpose of the offer. You are not to take it as meaning that, well, if he was convicted in 1976 he is a bad person, and he must have done it again, or anything like that. It is limited solely to prove one of the elements of the crime of capital felony, it is that element which distinguishes murder from capital felony . . . ." Although we approve of this instruction, and rely on it to limit the use of such prejudicial evidence in the case in which the prior conviction has been properly introduced, it has no application where the state should not have been allowed to introduce the evidence in the first place.

[15] To effectuate the principles we espouse, the following procedures should be utilized. In future cases, the trial court should read a redacted information to the venire panel and present a redacted information to the jury, but should specifically instruct the jury that the information is incomplete, and that, if the jury finds the defendant guilty of the present murder, it will then be presented with a second factual question to consider that is relevant to the capital felony charged.

cern about prejudice to the defendant and considerations of judicial economy.[16]

Our decision in this case places no undue burden on the trial court. There are always certain difficulties

[16] This bifurcated procedure has been recognized as an effective method of severing counts that depend on proof of a past criminal conviction from those that do not. In *United States* v. *Joshua*, 976 F.2d 844 (3d Cir. 1992), the defendant, who was charged with, among other crimes, being a convicted felon in possession of a firearm, had unsuccessfully moved to sever the felon-in-possession charge from the other charges in a multicount indictment. On appeal, the court agreed with the defendant that the counts should have been bifurcated so that "[t]he defendant's criminal past is not made known to the jury until after they have reached a verdict with respect to the other charges." Id., 848; see also *United States* v. *Busic*, 587 F.2d 577, 585 (3d Cir. 1978), rev'd on other grounds, 446 U.S. 398, 100 S. Ct. 1747, 64 L. Ed. 2d 381 (1980); *United States* v. *Edwards*, 700 F. Sup. 837, 838 (W.D. Pa. 1988); *Chapple* v. *State*, 866 P.2d 1213, 1217 (Okla. Crim. App. 1993).

In *United States* v. *Jacobs*, 56 Crim. L. Rep. (BNA) 1395 (3d Cir. January 12, 1995), the defendant, charged with possession of a firearm by a convicted felon, took the argument one step further to ask that this bifurcation procedure be extended to permit bifurcation of the elements of a single offense. The court, in a two to one opinion, declined the invitation, stating that such a procedure would result in serious problems because, without knowing all the elements of the offense, the jury might question whether the accused's conduct constituted a crime. Id., 1395–96; see *United States* v. *Birdsong*, 982 F.2d 481 (11th Cir.), cert. denied, 508 U.S. 980, 113 S. Ct. 2984, 125 L. Ed. 2d 680 (1993) (possession of firearm by most people is not crime); *United States* v. *Collamore*, 868 F.2d 24, 28 (1st Cir. 1989) (without reading criminal statute, doubt as to criminality of conduct could influence jury's consideration of possession).

The request in *Jacobs*, however, is more like the request made by the defendant in *State* v. *Banta*, supra, 15 Conn. App. 174, than the request by the defendant in this case. In *Banta*, the Appellate Court cautioned that to bifurcate the prior conviction from the current possession offense would leave the defendant being charged with an allegation of conduct that did not constitute a cognizable offense. Id., 173. Such problem does not exist when a defendant has been charged with a violation of § 53a-54b (3). In a case under § 53a-54b (3), the jury can be presented with the charge of murder in violation of § 53a-54a, and thereafter be presented with the prior murder conviction. There would be no doubt as to the criminality of the defendant's conduct. Additionally, in *Jacobs*, as in *Banta* and other cases in which the court denied the request to bifurcate the offense of possession of a weapon by a convicted felon, the prejudice to the defendant was minimal because the jury did not need to learn of the specific type of prior offense. See *United States* v. *Nguyen*, 793 F. Sup. 497, 505 (D.N.J. 1992).

inherent in any pretrial determination. Whether to sever counts, to sever trials against multiple defendants or to allow misconduct evidence are but a few of the many issues trial courts must resolve during pretrial proceedings. In short, the burden we place upon the trial court today is no greater than the burden it already carries.[17]

### III

We address the defendant's third claim on appeal because, although we have ordered a new trial, this issue could arise again. The following additional facts are undisputed. On September 12, 1991, the state's motion to obtain nontestimonial evidence from the defendant was granted by the court, *Quinn, J.*, pursuant to Practice Book § 775.[18] Thereafter, on the basis of the state's representation that it had learned from defense counsel that the defendant was unwilling to comply with the order, the trial court directly questioned the defendant, who stated that he refused to comply with the order because it violated his religious beliefs. The court took no further action because it understood that new motions and briefs on the issue were forthcoming. The state then moved to compel the taking of nontestimonial evidence from the defendant, and the defendant moved to reopen the hearing of September 12, 1991, claiming that: (1) the taking of specimens of his hair, blood and saliva would violate his right to religious freedom under the first amendment to the United States constitution; and (2) the taking of the

---

[17] It is important to emphasize that the trial court retains discretion to decide, even when bifurcation is required, that evidence that is otherwise admissible may be admitted. Therefore, if at the new bifurcated trial, the state seeks to offer Harris' testimony, the trial court should engage in the traditional balancing test to determine its admissibility. Additionally, if the defendant opens the door to the prior conviction evidence, the state should not be precluded from introducing it despite the bifurcation.

[18] The court granted the state's motion to obtain specimens of the defendant's hair, blood and saliva.

specimens would violate his right to religious freedom under article first, § 3, of the Connecticut constitution. The defendant filed separately a memorandum describing Islamic law and explaining his reliance on its scriptures as the basis for his objections to the compulsory testing. The state objected and the defendant, now proceeding pro se following a waiver of his right to counsel, responded with further specific information about his religious beliefs. On February 6, 1992, the trial court, *Corradino, J.*, granted the state's motion for compulsory testing.[19] Following an additional hearing on the subject on March 3, 1992, the court amended its order to deny the taking of a saliva sample, but left intact the granting of the requests for hair and blood samples.

At trial on July 15, 1992, Steven Grasso, the chief inspector with the office of the chief state's attorney for the state of Connecticut, testified that he went to the Whalley Avenue correctional center on March 18, 1992, to take blood and hair samples from an inmate.[20] Grasso initially had received a call from the state's attorneys office for the judicial district of New Haven advising him that the "defendant had indicated that he did not wish to give a blood sample, that [the state] had a court order, and that [the state] thought maybe someone should go along to assist the phlebotomist in taking blood." Grasso brought four inspectors with him. The defendant was brought unrestrained to the infirmary where he was told of the reason for their pres-

---

[19] The trial court also held the defendant in contempt and continued the matter to give the defendant an opportunity to purge himself. On February 19, 1992, the court set conditions for the taking of the samples. No further action was taken in connection with the contempt citation.

[20] The defendant, who proceeded pro se throughout the trial, failed to object to the references to the jail or his status as an inmate. He also failed to object to the introduction into evidence of the transcripts of the hearings and the revised order pertaining to the state's ability to obtain the samples.

ence. Grasso testified that the defendant "was not pleased with that idea, so he indicated that he would not do it. I then spoke to him and told him that we had the court order, we definitely would be taking the blood one way or the other, but I would prefer without any violence involved. He then chose to speak to someone, I'm not sure, I think someone from the public defender's office was there, a private investigator that represented Mr. Jones and a third party was there that he spoke to somewhere out in the hall. He came back in, he indicated that he would submit to the blood sampling." When asked if the defendant did so without violence, Grasso testified, "absolutely." He then described the process by which he took several hair samples from both the defendant's head and his right arm. Grasso added that the defendant had told him that his reluctance was based upon his religious beliefs.

At the end of the evidence portion of the trial, the state indicated its intention to file a request to charge that the defendant's refusal to give the samples showed consciousness of guilt. When presented with the actual written request, the defendant objected. He argued that although he had earlier objected to the taking of samples and was even successful in his attempts to get the court to limit the order, he complied without the need for any force. "I have a constitutional right to claim religious freedom and I did so. They asked me to respond in writing and I responded in writing, we argued back and forth, we got relief month after month and then the final argument went in and it was concluded, and there again, once they arrived at the facility, I stated my constitutional claim and then I submitted to that. So, you know, it's not an issue of consciousness of guilt."[21] Nevertheless, the trial court

[21] The state argues that this claim is not reviewable because the defendant "did not object either to the evidence presented at trial or to the jury instruction on the issue of consciousness of guilt." In light of the afore-

instructed the jury that it could consider the defend-
ant's conduct as consciousness of his guilt.[22]

The defendant argues that this charge was improper
because "[p]osing legal objections to invasive physical
testing procedures, by legal motions and arguments at
pretrial hearings, based upon religious grounds, cannot
be the basis of a consciousness of guilt instruction."
Under the circumstances of this case, we agree.

mentioned objection, we disagree. Practice Book § 852 requires a written
request to charge or an exception to be taken by the party appealing imme-
diately after the charge is delivered. The exception may be taken outside
the presence of the jury. In this case, the defendant, who was acting pro
se, put the trial court on notice that he objected to the instruction. We have
often relaxed the rules and exhibited some degree of leniency where pro
se litigants are concerned. See *Swenson* v. *Dittner*, 183 Conn. 289, 295 n.3,
439 A.2d 334 (1981); *Maresca* v. *Allen*, 181 Conn. 521, 521 n.1, 436 A.2d
14 (1980). Our review of the record reveals a lengthy discourse that dem-
onstrates to us that the trial court knew of the defendant's objection. We
therefore consider this to be an appropriate case in which to relax the
requirement of an exception immediately following the charge.

Moreover, because it was the instruction, not the evidence, that permit-
ted the jury to infer a guilty conscience, the lack of objection to the evi-
dence bears little relation to whether the jury instruction should be reviewed.
The guilty conscience inference was invited by the trial court. If it had not
been suggested, the jury, in all probability, would not even have contem-
plated whether to infer a guilty conscience from the defendant's aversion
to intrusive tests that did nothing to incriminate himself.

[22] The court charged the jury as follows: "Now, the law of our state recog-
nizes a principle known as consciousness of guilt or admissions by conduct.
Certain actions or statements of a person may be considered by you to show
a guilty knowledge or consciousness of guilt.

"When a person is on trial for a criminal offense, it is proper to show
his conduct subsequent, after, the alleged criminal offense which may fairly
have been influenced by that act.

"There has been testimony and other evidence offered in this case that
the defendant refused to cooperate even after being ordered to do so by
the court in allowing samples of his blood and hair to be taken for possible
use in testing.

"Now, I want to stress that the defendant had a right to make appropri-
ate legal objections to the request for the blood and the hair sample and
he had a right to be heard by a judge in connection with those objections
and he was. However, once the court, the judge, heard those objections,
he listened to those objections and had ordered the defendant to give the

In sorting through the defendant's claims, we first must point out what is not at issue. The defendant does not claim that a trial court is powerless to order the forcible extraction of blood from a suspect. See *Schmerber* v. *California*, 384 U.S. 757, 761, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) (extraction of blood not compelled testimony for fifth amendment purposes). Certainly Practice Book § 775 contemplates a trial court's authority to order a defendant's cooperation once the state has made the requisite showing of need and probable cause, and the defendant does not challenge the validity of the court order in question. The defendant also is not arguing that his religious beliefs shield him from having to comply with an otherwise valid court order. See *United States* v. *Lee*, 455 U.S. 252, 260, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982) (government can require Amish employer to pay social security tax even if religion bars participation in government programs). Further, the defendant is not challenging the authority of a trial court, in appropriate circumstances, to give a consciousness of guilt instruction, a charge which has a long history of precedent in this state. See J. Bruckmann, G. Nash & J. Katz, Connecticut Criminal Caselaw Handbook (1989) p. 446, and (Sup. 1992) pp. 453–54. Thus, the single issue before the court is whether, under the circumstances

blood and hair samples, the defendant was obligated to obey that order.

"There was evidence in this case that the defendant submitted only when physical force was about to be used to obtain compliance with the court's order.

"The state has also presented evidence that the hair samples taken did not provide a match between the defendant and the single hair found in the victim's car. And the state claims that the defendant's refusal to give samples of his blood and hair showed consciousness of guilt on his part. You heard [the assistant state's attorney's] argument in that respect.

"Now, if you find that this defendant did intentionally refuse to give samples for use in forensic testing, whatever the ultimate results of those tests, you are permitted to find that those actions tend to show a guilty connection with the crime."

of this case, the defendant's conduct was probative of a guilty conscience or whether the instruction, in effect, punished the defendant, who, based upon his religious beliefs, had used proper and available avenues to challenge the court orders.

Historically, we have recognized various kinds of conduct from which a fact finder may infer a guilty conscience. See, e.g., *State* v. *Leecan,* 198 Conn. 517, 534, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986) (letter indicating defendant's intent to seek reprisal against witness for testifying for state); *State* v. *Reid,* 193 Conn. 646, 656, 480 A.2d 463 (1984) (attempt to fabricate alibi); *State* v. *Ferrara,* 176 Conn. 508, 516–18, 408 A.2d 265 (1979) (evidence of flight). From the state of mind that we call "guilty consciousness" comes the inference that the actor committed the guilty deed. It is not this inference that has caused controversy. Rather it is the first step "in the process of inferring the existence of that inner consciousness from the outward conduct, [in which] there is ample room for erroneous inference; and it is in this respect chiefly that caution becomes desirable and that judicial rulings upon specific kinds of conduct become necessary." 2 J. Wigmore, Evidence (Chadbourn Rev. 1979) § 273, pp. 115–16.

Conduct from which the state asks the jury to infer a guilty conscience "is a species of evidence that should be viewed with caution; it should not be admitted mechanically." *United States* v. *Hernandez-Bermudez,* 857 F.2d 50, 54 (1st Cir. 1988). Whether particular conduct is an index of guilt depends on the particular circumstances. The probative value of the evidence of the defendant's conduct depends on the degree of confidence with which the inference can be drawn. *United States* v. *Dillon,* 870 F.2d 1125, 1127 (6th Cir. 1989). "Before evidence is allowed to be given, the court must

also consider whether its prejudicial tendency outweighs its probative value." (Internal quotation marks omitted.) *State* v. *Reid,* supra, 193 Conn. 655–56.

In *State* v. *Mayell,* 163 Conn. 419, 425–26, 311 A.2d 60 (1972), this court held that a defendant's exercise of his legal right to defend against extradition proceedings was not a proper basis for inferring that the defendant had fled from the police or had possessed consciousness of guilt. The facts of that case are enlightening. The state produced the following evidence. The robbery for which the defendant stood trial occurred on August 21, 1968, in Watertown, Connecticut. The defendant was employed as a driver for Unger, the chairman of the board of a New York company. On August 21, the defendant drove Unger to his New York City home at 6 p.m. His duties required him to garage the vehicle directly across the street from the Unger residence. Early the next morning the vehicle was located in Watertown. It was learned that the vehicle had not been returned to the garage as required on the evening of August 21. The company was unable to reach the defendant. On August 22, the defendant telephoned his employer, but he never bothered to pick up his paycheck. A detective testified, without detail, that he had made attempts to contact the defendant. Months later, the police located the defendant in New York and began extradition proceedings. Id., 423.

The defendant offered evidence to prove that he had spent the evening at his girlfriend's home, that he had left the car on the street in New York with the keys on the visor, that the vehicle was gone the next morning, that he attempted to locate it at the pound, that he spoke with the Unger housekeeper and learned of his employer's displeasure, and that, knowing he would be fired, he chose to avoid the humiliation of returning to his job for the three days salary he was owed. Id., 423–24. Finally, the defendant testified that he first

learned of the robbery when extradition papers were served and that when extradition was denied he believed "it was all over." He was arrested at the Waterbury police station when he went there to inquire about his driver's license. Id., 424. The state then introduced evidence that the defendant had contested his extradition to demonstrate a consciousness of guilt. We held that because there was no other probative evidence of flight by the defendant, the evidence was insufficient to support a conclusion that he had fled to avoid apprehension.[23] Id., 425–28; see also *State* v. *Burak*, 201 Conn. 517, 529, 518 A.2d 639 (1986) ("a defendant's exercise of his legal right to defend against extradition proceedings is not a proper basis for inferring that the defendant fled from the police or possessed consciousness of guilt").

The lack of evidence of consciousness of guilt in this case is equally apparent. The defendant did that which the law allows and even encourages. The defendant relied on the book of Quran and its teachings to resist passively the tests he believed to be physically intrusive. First through counsel and then acting pro se, by moving to reopen the issue to explain fully to the court his objections to the test, the defendant properly took advantage of our court system and the legal protections and safe gap measures it affords. His partial success in eliminating the saliva test demonstrates this. That he finally complied only after exhausting the legal process is not a valid basis from which one may infer guilt. That he verbally told Grasso that the tests violated his religious beliefs provides no greater basis. Under the facts and circumstances of this case, where

---

[23] In *State* v. *Burak*, 201 Conn. 517, 529, 518 A.2d 639 (1986), we repeated that "a defendant's exercise of his legal right to defend against extradition proceedings is not a proper basis for inferring that the defendant fled from the police or possessed consciousness of guilt." The erroneous admission of that evidence was harmless because of the existence of other evidence of flight from the state. Id., 530.

the defendant, on the basis of his religious beliefs, and with some success, took proper advantage of our legal process to challenge the state's efforts to compel the taking of nontestimonial evidence, where the defendant allowed Grasso to take the evidence without the need to use physical compulsion and where the results of the tests on the evidence have absolutely no probative value of the defendant's guilt,[24] the court may not instruct the jury that it may draw the inference that the defendant's conduct is evidence of a guilty conscience.

The judgment of conviction is reversed and the case is remanded for a new trial in accordance with this opinion.

In this opinion PETERS, C. J., and BERDON and PALMER, Js., concurred.

BORDEN, J., concurring and dissenting. I agree with parts I and III of the majority opinion, in which the majority holds that: (1) the evidence was sufficient for conviction; and (2) the trial court improperly gave a consciousness of guilt instruction regarding the defendant's initial refusal to submit to certain tests.[1] I disagree, however, with part II of the opinion, in which the majority, pursuant to our supervisory power over the administration of justice, orders a new, bifurcated trial for the defendant. I therefore dissent.

The majority in effect has established the following rule: in a prosecution under General Statutes

---

[24] The state sought the consciousness of guilt charge although all the tests involved proved negative. To allow such a charge in this case would, in effect, allow the state to gain from the charge that which it was unable to gain from the evidence.

[1] Although I agree with the majority that the trial court should not have given the consciousness of guilt instruction, I would hold that it was harmless under the facts of this case. I would not, therefore, reverse the judgment of conviction.

§ 53a-54b (3),[2] unless the state can demonstrate, prior to trial, that there is a need to avoid a bifurcated trial, the trial must be bifurcated so as to require, in the first part of the trial, the state to prove and the jury to find only that the defendant committed the instant murder, and, in the second part of the trial, the state to prove the defendant's prior murder conviction. Thus, the majority has effectively established a presumption of bifurcation that the state has the burden of rebutting. The state's burden, moreover, is to establish the admissibility of evidence of the defendant's commission of the prior murder that is necessary to prove: (1) his identity as the murderer; (2) his intent to murder; or (3) an element of the murder. In addition, while creating an entirely new rule of procedure with an entirely new burden on the state, the majority precludes the state from even attempting to meet this new burden on the remand in this case. I disagree. I would follow a different route, which brings me to a different result in this case.

I agree that, in a prosecution for capital felony under § 53a-54b (3), the trial court has the discretion to structure the trial so as to bifurcate the element of the prior murder conviction from the element of the current murder charged. I would, however, leave that question to the discretion of the trial court, as we do generally regarding questions of severance and joinder, subject to review for an abuse of that discretion. Applying that standard to the facts of this case, I would find no abuse of discretion, and would affirm the judgment.

---

[2] General Statutes § 53a-54b provides in relevant part: "CAPITAL FELONY. A person is guilty of a capital felony who is convicted of any of the following . . . (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony . . . ."

## I

There are several aspects of the majority opinion with which I take issue. I discuss them initially because, in my view, they flaw the majority's analysis and support mine.

## A

I disagree with the majority's characterization of the state's position in oral argument in this court regarding the issues of prejudice to the defendant caused by the introduction of evidence of the prior homicide and of the prejudice caused to the state by bifurcation. I believe that the majority misconstrues the state's argument on the first issue and is unduly harsh in its assessment of the second issue.

In responding to questions at oral argument about whether the defendant was "prejudiced" by the evidence, the state repeatedly replied that any "prejudice" was legitimate, because the prior conviction was an element of the capital felony with which he was charged.[3] The majority asserts that the essence of the state's argument is that "the legislature has 'authorized' substantial prejudice." I disagree with this assessment of the state's argument. The state's argument was nothing more than the assertion that a defendant is prejudiced by any relevant inculpatory evidence that is introduced at trial. That is precisely why the state, or

---

[3] The state argued: "But, the legislature has determined, Your Honor, that that is a legitimate prejudice, so long [as] it is used properly. The legislature hasn't considered this just a sentencing enhancer. This is a legitimate prejudice.

"The word prejudice has to be used in the right context. There's prejudice which is improper, and there's prejudice that's appropriate. If you've made an element of the crime prejudiced, I think this court would be rewriting the statute by, first of all, not just bifurcating, but in a real capital case, where the death penalty was sought, trifurcating the hearing. You would have three separate trials."

any litigant in any case, introduces evidence against its adversary. In this case, evidence of the prior murder was relevant to prove that the defendant had been convicted of a prior murder, an element of the capital felony charge. The relevant question is not whether the evidence is prejudicial, but whether it is *unfairly* prejudicial—whether its prejudicial effect outweighs its probative value. See *State* v. *Higgins*, 201 Conn. 462, 469, 518 A.2d 631 (1986). The state explicitly and repeatedly argued, both in its brief and at oral argument, that the evidence was not unfairly prejudicial if used by the jury only as evidence of the relevant element of the crime of capital felony, namely, a prior conviction for murder, and took the position, which is correct in my view, that the court's limiting instruction was sufficient to ensure that the jury did not consider his prior conviction for any other purpose.

I also think the majority is unduly harsh in its assessment of the state's argument as to why bifurcation would prejudice the state in this case. The entire question of whether a bifurcated trial would have caused the *state* any prejudice, as opposed to whether an unbifurcated trial would cause the *defendant* unfair prejudice, was simply never presented to the trial court or to this court in the briefs of the parties. Indeed, it was not even part of the defendant's oral argument in this court. The gist of the defendant's brief, and the way in which he opened his oral argument in this court, was that this case was controlled by the reasoning of *State* v. *Ferrone*, 96 Conn. 160, 116 A. 452 (1921), rather than the reasoning of *State* v. *Banta*, 15 Conn. App. 161, 544 A.2d 1226, cert. denied, 209 Conn. 815, 550 A.2d 1086 (1988). Thus, when the state, in response to questioning by this court, responded that bifurcation would "change the dynamics" of the trial,[4] it was

---

[4] When asked whether the state would be prejudiced by bifurcation, the state responded: "I think that it—that the state certainly would have a

doing so without the benefit of having read the record, prepared its brief and presented its oral argument with that particular question in mind. I think it unfair of the majority to assert that the only meaning that could be ascribed to this statement is that the state was concerned that it "would not have been able to use the evidence of the prior murder to create the impression in the jurors' minds that this defendant was predisposed to kill." Given that the state had no prior opportunity to consider the issue and that the focus of the state's answer actually pertained to the prejudice it would suffer in a situtation where it was seeking the death penalty, I do not think that the state's reluctance to concede the issue should lead the majority to conclude that the state was seeking to preserve its ability "to inflame the jury's passion." Indeed, the state's support of the limiting instruction given by the court belies such an improper motive. Heard fairly and in context, therefore, the state was merely suggesting that it would suffer greater prejudice in a case in which the state did seek the death penalty.

The unfairness of the majority's interpretation of the state's argument is made more egregious because it is the basis of the majority's conclusion that, on the

---

greater—a more extensive procedure. I think it changes the dynamics of the case. Maybe not in this case, where they didn't seek the death penalty. But, it would when you're death qualifying a jury, and you're trying to find from the jury those factors. For instance, you voir dire a death qualified jury. And you're determining what factors are going to go into, not only their consideration of the case, but what they're going to do when they reach the sentencing phase. How are they going to be prejudiced? Then you're not going to inform them [of] the fact that an element of the capital felony that you're charging is a prior murder, and how that [a]ffects the whole outcome of the case.

"And of course, here, the answer could be—Well, the defendant didn't have to worry about that. He wasn't facing the death penalty. And he made a request. But, if you make that as a policy for the courts, then does it have to be followed at all times? It does change the dynamics of a capital felony. It does change the dynamics of the trial."

remand, the trial *must* be bifurcated and the state need not be given the opportunity to show prejudice. In doing so, the majority has created a rule of bifurcation that, by its own reasoning, neither the trial court nor the state could have reasonably anticipated, and yet the majority has precluded the state on the remand from even attempting to comply with a burden that it never knew it had. Just as the seriousness of the charge of capital felony requires close scrutiny to ensure fairness to the defendant, the same seriousness of the charge requires that the state be treated fairly in its attempt to prove that charge.

## B

I also disagree with the majority's statement that the purpose of the legislature, in enacting § 53a-54b (3), was "not to define a new type of crime, but rather to enhance the sentence for an activity that is already classified as a crime." The majority offers no support for this inference of legislative purpose, except to state that "[l]ogic tells us that subdivision (3) is incorporated into § 53a-54b as a matter of convenience so that all capital crimes can be located in one place and that the legislature had no other agenda." I disagree that logic supports a reading of the statute that is found nowhere in its language or in its legislative history. The attribution of such an intent to the legislature rewrites our current legislative scheme regarding capital felonies, and denigrates the care with which the legislature defined the crime of capital felony and the sentence that follows conviction of the most serious crime in our state.

I agree that capital felony is a form of the generic crime of murder, as is arson murder under General Statutes § 53a-54d,[5] and indeed felony murder under

---

[5] General Statutes § 53a-54d provides: "ARSON MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits arson and, in the course of such arson, causes the death of a person.

General Statutes § 53a-54c.[6] That conclusion is consistent with our pre-penal code legislation, under which the single crime of murder was divided into two degrees. See *State* v. *Ellis*, 197 Conn. 436, 455, 497 A.2d 974 (1985), on appeal after remand sub nom. *State* v. *Paradise,* 213 Conn. 388, 567 A.2d 1221 (1990). It also follows from the language and structure of our current homicide statutes, under which murder is defined by General Statutes § 53a-54a, and pursuant to which "[m]urder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d." General Statutes § 53a-54a (c); see General Statutes § 53a-45 (a).[7]

That does not mean, however, as the majority suggests, that the legislative difference between capital

Notwithstanding any other provision of the general statutes, any person convicted of murder under this section shall be punished by life imprisonment and shall not be eligible for parole."

[6] General Statutes § 53a-54c provides: "FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[7] General Statutes § 53a-45 (a) provides: "MURDER: PENALTY; WAIVER OF JURY TRIAL; FINDING OF LESSER DEGREE. (a) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

felony as defined by § 53a-54b, including subdivision (3), and murder as defined by § 53a-54a is simply one of sentencing enhancement. Instead, the difference between the two is one of kind: capital felony is a more serious kind of murder than murder committed in violation of § 53a-54a. In effect, capital felony is to murder, under our current legislative scheme, as first degree murder was to second degree murder, under our legislative scheme that existed before the enactment of our penal code.

Before the enactment of the penal code, the difference between first and second degree murder was not simply one of sentence enhancement. "The more atrocious types of murder were enumerated and classified as murder in the first degree, and all other kinds of murder were classified as murder in the second degree." *McBrien* v. *Warden*, 153 Conn. 320, 326, 216 A.2d 432 (1966). After the effective date of the penal code in 1971, and after the enactment of the capital felony statutory scheme in 1973, the difference between murder and capital felony is, likewise, not simply one of sentence enhancement. It is a difference between murder as defined in § 53a-54a, which is punishable by a definite sentence of not less than twenty-five nor more than sixty years; General Statutes §§ 53a-35a (2)[8] and 53a-35b;[9] and capital felony as defined in § 53a-54b,

---

[8] General Statutes § 53a-35a provides in relevant part: "IMPRISONMENT FOR ANY FELONY COMMITTED ON OR AFTER JULY 1, 1981: DEFINITE SENTENCES; TERMS AUTHORIZED. For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows . . . (2) for the class A felony of murder, a term not less than twenty-five years nor more than life . . . ."

[9] General Statutes § 53a-35b provides: " 'LIFE IMPRISONMENT' DEFINED. A sentence of imprisonment for life shall mean a definite sentence of sixty years, unless the sentence is life imprisonment without the possibility of release, imposed pursuant to subsection (f) of section 53a-46a, in which case the sentence shall be imprisonment for the remainder of the defendant's natural life."

which is punishable by death or by "imprisonment for the remainder of the defendant's natural life." General Statutes § 53a-35b.

That is why the *elements* of capital felony,[10] including subdivision (3), are defined by § 53a-54b, and the *sentence* therefor is defined by General Statutes § 53a-46a (f).[11] By lifting subdivision (3) from the context of 53a-54b, and calling it merely a sentencing enhancement provision, the majority performs a judicial tour de force that has no support in the legislative language, structure or history.

When the legislature wants to create sentencing enhancers based on prior convictions, it knows how to do it. Compare, e.g., General Statutes §§ 53a-40 (persistent offenders), 53a-40a (persistent offenders of crimes involving bigotry and bias), and 53a-40b (additional term of imprisonment authorized for offense committed while on release). It did not do so in enacting § 53a-54b (3). It made the prior conviction an element of the crime, and provided the particular sentence for conviction: either death or imprisonment for the

---

[10] The majority, in distinguishing this case from *State* v. *Banta,* supra, 15 Conn. App. 161, reads that case selectively. Although most of the discussion in *Banta* focused on the fact that, as in this case, the prior conviction was an element of the crime charged, and that the rule of *State* v. *Ferrone,* supra, 96 Conn. 160, and its Practice Book analogues, apply only to recidivist charges; see *State* v. *Banta,* supra, 173–74; the majority refers to but one sentence of *Banta,* and that sentence is preceded by the word "additionally," which the majority does not quote: "*Additionally,* an information alleging only that a defendant possessed a handgun, without mention of his prior conviction, would fail to allege any cognizable offense under our penal code." (Emphasis added.) Id., 173.

[11] General Statutes § 53a-46a (f) provides: "If the jury or, if there is no jury, the court finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury or, if there is no jury, the court finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release."

remainder of the defendant's natural life, depending on the fact finder's determination regarding aggravating and mitigating factors.

C

In addition, I believe that the majority vastly understates the degree of difficulty that its ruling places on the trial court following the remand in this case, and in future cases prosecuted under § 53a-54b (3). The majority's ruling imposes on the trial court a number of difficult and unprecedented questions that will inevitably arise, for which it provides no guidance.

Although in this case, the state did not seek the death penalty, and thus the trial will only be bifurcated, what of the case in which the state does seek such a penalty? Presumably, there will then be a trifurcated trial. Moreover, in such a case, how will the trial court and counsel conduct the voir dire? Will the court be barred from telling the venirepersons being questioned in a death penalty case what the particular capital felony is that they will be undertaking to consider?

Moreover, what if, the trial having been bifurcated, the defendant takes the stand and testifies in such a way that would make the prior conviction admissible for impeachment? May the court now *un*bifurcate? If not, then what was the value in bifurcation? Furthermore, what if the defendant asserts a defense of mental disorder or defect, or extreme emotional disturbance? In such a case, the evidence of his prior conviction would be admissible to impeach his expert's testimony. See *State* v. *Carter*, 198 Conn. 386, 503 A.2d 576 (1986). Presumably, under the majority's formulation, however, neither of these situations would be sufficient to preclude bifurcation, because the evidence of the prior murder is not relevant—except in the most indirect and attenuated way—to the defendant's identity as the mur-

derer, to his intent or to an element of the crime. I see no gain for the administration of criminal justice in such a rule of bifurcation.

Furthermore, I believe that the majority has masked the difficulty of the trial court's task in determining, pretrial, whether the state has established prejudice by bifurcation, presumably by, for example, convincing the trial court that the evidence regarding the prior conviction will be admissible anyway. It is difficult enough for trial courts to make accurate evidentiary rulings during a trial, when they have the benefit of an overview of the evidence and are able to weigh probative value against unfair prejudicial effect in the context of that evidence. The majority's ruling *requires* the trial court to make such determinations pretrial, and places the burden of establishing the admissibility of the evidence on the state.

Even under the example that the majority offers, namely, where the state seeks to introduce the prior conviction as evidence of a signature crime, the admissibility of such evidence requires a delicate balancing process, and will require the state to establish, and the court to envision, the nature of the evidence of the current crime—before any such evidence is presented in the courtroom, and is tested by cross-examination—and then for the court to rule on its admissibility in an evidentiary vacuum. It is precisely because of that difficulty that a trial court often will prudently postpone ruling on a motion in limine, seeking to preclude or admit evidence, until the evidence that is the subject of the motion is offered during the trial.

Thus, the majority, by requiring such a determination pretrial, assumes that the question of admissibility will be fairly clear cut. I do not share that assumption.

## II

This brings me, therefore, to the following three questions under § 53a-54b (3): (1) Is a trial court precluded from bifurcating the jury's determinations of the defendant's guilt of the current murder and his prior conviction of murder? (2) If not, what standards should the trial court employ in making such a determination, and what standard of review should we employ? and (3) Did the trial court's denial of the motion for bifurcation deprive the defendant of a fair trial in this case? In my view, the answer to the first question is in the negative; the answer to the second question is that the trial court should exercise its discretion as it does in deciding whether to sever or join separate charges against a defendant; and the answer to the third question is in the negative.

## A

In a prosecution under § 53a-54b (3), I do not believe that a trial court is precluded, as a matter of law, from bifurcating the trial, as requested by the defendant in this case, solely because the bifurcation would involve separate determinations regarding elements of the offense. It is true that, although bifurcation of liability and damages is fairly common in civil litigation, bifurcation of the elements of a crime is unprecedented in our criminal jurisprudence. Nonetheless, I believe that a trial court has the inherent power to require such a bifurcation in the interests of justice, and that a prosecution under § 53a-54b (3) may, in an appropriate case, justify such a bifurcation.[12]

---

[12] In this respect, although I disagree with the majority that the legislature, in enacting § 53a-54b (3), was simply enacting a sentence enhancer, I agree with the majority that the legislature simply did not envision the question of bifurcation, and did not intend to encroach on the court's inherent power over the management of trials in the interests of justice.

My research indicates that there are three other states whose capital crimes statutes contain provisions similar to § 53a-54b (3): Utah, Oregon and Idaho. Several other states, including Florida, Missouri, New Jersey, New Hampshire and Ohio, make a prior murder conviction an aggravating factor in the sentencing phase of the trial.

The Utah Supreme Court has determined, pursuant to its inherent supervisory power, that such a trial must be bifurcated, but that the failure to do so is subject to harmless error analysis. *State* v. *Florez*, 777 P.2d 452 (Utah 1989); see also *State* v. *Gardner*, 789 P.2d 273 (Utah 1989), cert. denied, 494 U.S. 1090, 110 S. Ct. 1837, 108 L. Ed. 2d 965 (1990) (failure to bifurcate held harmless). The Oregon Court of Appeals has determined that bifurcation is not required because the Oregon statutory scheme specifically permits the defendant to eliminate the prior conviction from being presented to the jury by stipulating to it, which stipulation the court must accept regardless of whether the state agrees to it. *State* v. *Earp*, 686 P.2d 437 (Or. App.), rev. denied, 691 P.2d 483 (Or. 1984). Idaho has not decided the question.

It is clear that bifurcation is not required as a matter of the federal due process clause. *Marshall* v. *Lonberger*, 459 U.S. 422, 438 n.6, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983); *Spencer* v. *Texas*, 385 U.S. 554, 567–68, 87 S. Ct. 648, 17 L. Ed. 2d 606 (1967). The majority does not purport to rest its decision on our state constitution.[13]

Thus, the majority in this case has chosen a path of adjudication that is unprecedented, in our own jurisprudence as well as the jurisprudence of the three states

---

[13] Although the defendant mentioned the state constitution in his brief, he failed to present an independent and adequate state constitutional analysis.

that share this unusual capital crime configuration.[14] Nonetheless, I recognize the risk of unfairness to the defendant when his prior murder conviction is introduced into evidence as an element of the capital felony with which he is charged.

I do not, however, share the majority's assumption that the risk is so overwhelming that it cannot be gauged in the context of a particular case, and that it cannot be met with proper cautionary instructions. As the United States Supreme Court has noted: "[T]he most recent scholarly study of jury behavior does not sustain the premise that juries are especially prone to prejudice when prior-crimes evidence is admitted as to credibility. Kalven & Zeisel, The American Jury (1966). The study contrasts the effect of such evidence on judges and juries and concludes that '[n]either the one nor the other can be said to be distinctively gullible or skeptical.' *Id.*, at 180." *Spencer* v. *Texas*, supra, 385 U.S. 565 n.8. In my view, the risk involved in this case is essentially the same type of risk that the trial and appellate courts of this state have been weighing for decades in determining whether trials should be joined or severed. Thus, I do not think that a rebuttable presumption of bifurcation is necessary or appropriate in a case such as this.

## B

I would apply the reasoning of the basic rules that govern the question of joinder and severance, which is the juridical model closest to the question of bifurcation presented by this case.

The general rules that govern the question of joinder and severance are as follows. "General Statutes § 54-57

---

[14] Although Utah has chosen a path similar to that of the majority, the Utah cases differ significantly because, unlike the majority in this case, which presumes harmful error from the failure to bifurcate, Utah subjects the failure to bifurcate to harmless error review.

and Practice Book § 829 authorize a trial court to order a defendant to be tried jointly on charges arising separately. In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. *State* v. *Greene,* 209 Conn. 458, 463, 551 A.2d 1231 (1988); *State* v. *Pollitt,* 205 Conn. 61, 67–68, 530 A.2d 155 (1987); *State* v. *Boscarino,* 204 Conn. 714, 720–21, 529 A.2d 1260 (1987); *State* v. *Bell,* 188 Conn. 406, 410–11, 450 A.2d 356 (1982); *State* v. *King,* 187 Conn. 292, 299, 445 A.2d 901 (1982); *State* v. *Jonas,* 169 Conn. 566, 570, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976). The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions. *State* v. *Boscarino,* supra, 721, quoting *State* v. *King,* supra, 302; *State* v. *Silver,* 139 Conn. 234, 240, 93 A.2d 154 (1952).

"This court recently reexamined the undeniable tension between the need to conserve judicial resources by consolidating cases and the defendant's right to a fair trial. In *State* v. *Boscarino,* supra, [204 Conn.] 721, we held that the trial court had erred in joining four separate counts of sexual assault in the first degree against the defendant because the joinder worked a substantial injustice . . . beyond the curative power of the court's instructions. We there discussed several factors that a trial court should consider in making its determination whether severance is required in order to avoid the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. *United States* v. *Lotsch,* 102 F.2d 35, 36 (2d Cir.), cert. denied, 307 U.S. 622, 59 S. Ct. 793, 83 L. Ed. 1500

(1939). *State* v. *Boscarino,* supra, [204 Conn.] 721–22.
These factors include: (1) whether the charges involved
discrete, easily distinguishable factual scenarios; (2)
whether the crimes were of a violent nature or con-
cerned brutal or shocking conduct on the defendant's
part; and (3) the duration and complexity of the trial.
[*State* v. *Boscarino,* supra,] 722–23. We held that if any
or all of these factors were present, a reviewing court
would have to decide whether the trial court's jury
instructions cured any prejudice that might have
occurred. Id., 724." (Internal quotation marks omitted.)
*State* v. *Herring,* 210 Conn. 78, 94–95, 554 A.2d 686,
cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed.
2d 579 (1989).

The *particular* factors that come into play in the trial
court's joinder or severance determination—namely,
whether the factual scenarios are distinguishable,
whether the crimes present brutal or shocking conduct
by the defendant, and the duration and complexity of
the trial—do not apply to the question of bifurcation
under § 53a-54b (3). The reasoning underlying the appli-
cation of those factors, however, does apply.

That reasoning is that joinder ought to be the rule,
in the interests of conserving judicial resources, but that
if any of those factors was present the question on
appeal is the effectiveness of the trial court's instruc-
tions as a cure for any prejudice that might have
occurred as a result of the joinder. Thus, the linchpins
of the inquiry are whether the trial court abused its dis-
cretion in joining, rather than severing, the separate
charges, and whether the trial court's instructions suf-
ficiently protected the defendant against the risk of
unfair prejudice.

In applying this test, our courts in effect weigh the
risk that the jury will *improperly* use evidence that is
introduced for proper purposes, despite the instructions

of the court regarding the *proper* use of that testimony. This is similar to the process that our courts employ in determining the admissibility of evidence regarding prior convictions and other misconduct of the defendant. See *State* v. *Rivera,* 221 Conn. 58, 72–73, 602 A.2d 571 (1992).

Although in a case under § 53a-54b (3) the factor of conserving judicial resources is not present, the factor of giving respect to the legislative decision to define the elements of capital felony is present. That legislative decision was to include, as an element of the crime, and not merely as a sentence enhancer, the defendant's prior conviction, thus rendering him susceptible to the penalties of imprisonment for his natural life, or death. I believe that this legislative decision is sufficiently weighty so as to be at least equal to the weight accorded to the factor of conserving judicial resources in the severance and joinder cases. I would, therefore, leave the question of bifurcation under § 53a-54b (3) to the discretion of the trial court, subject on review to the test of abuse of that discretion,[15] and, if the trial court did not bifurcate the trial, I would ask whether the court's instructions, viewed in the context of the entire case, were sufficient to cure any possible prejudice.

C

Applying that standard, I conclude that the trial court did not abuse its discretion in denying the defendant's motion to bifurcate, and that its instructions were sufficient to cure any possible prejudice to him that

---

[15] Indeed, as I read the record, that is how the defendant treated the matter before the trial court. His motion seeking bifurcation relied on cases that involved the discretion of the trial court to exclude certain prejudicial misconduct evidence. Furthermore, in oral argument in this court, the defendant stated that if we determined that this case did not fall within the contours of *State* v. *Ferrone,* supra, 96 Conn. 160, we should find that the denial of the motion to bifurcate constituted an abuse of discretion in accordance with *State* v. *Nardini,* 187 Conn. 513, 447 A.2d 396 (1982).

attended the introduction of the evidence of his prior conviction. The most important factor leading to this conclusion is that certain evidence that very closely resembled the evidence of the defendant's prior conviction was introduced in this case without objection of the defendant, and that this evidence was at least facially admissible irrespective of the question of bifurcation.

That evidence was as follows. Frankie Harris testified on direct examination that she had been shown a photographic array on two separate occasions. On the first occasion, she intentionally misidentified two different people as resembling the person whom she had seen discard the camouflage jacket shortly after the shooting. Neither of these was the defendant. When asked by the state why she had identified these two persons, she testified that it was because when she described to her boyfriend the man whom she had seen discard the jacket, her boyfriend had identified that man as the defendant, but had advised her to "keep [her] mouth shut" because "Melvin Jones was no joke, he was a killer,"[16] and that he knew that "[b]ecause he had done time with him in Somers prison." She testified that her first identification of the two other persons was not the truth.[17]

Harris then testified that, after she heard that the defendant had been arrested, she contacted the police

---

[16] Furthermore, on cross-examination of Harris, the defendant elicited a repetition of this testimony:

"Q. Now going back a little bit. When you said that your boyfriend told you that he knew this guy, you mentioned the name Melvin Jones and he was no joke, he was a killer. Didn't you say that?

"A. Yes."

[17] The reason that, as the majority points out, the state did not rely on this testimony of Harris regarding the issue of prejudice to the state by bifurcation, is that, until raised by this court at oral argument, that issue was never in the case. Moreover, in this connection, the majority misreads *Ferrone* by claiming that one of the factors we considered in that case was the degree of prejudice to the state. I can find no such reference in *Ferrone*.

again. She was then shown the photographic array a second time, when she identified the defendant as the person who had discarded the jacket. She testified that the reason she identified the defendant the second time, but not the first, was that at the time of the second photographic identification the defendant "was locked up."[18]

The state introduced this testimony on Harris' direct examination, without objection by the defendant. Its obvious purpose was to show that her first, misidentification was the result of her fear of the defendant, resulting from her boyfriend's warning to her. Thus, the state sought to blunt in advance an anticipated attack on Harris' credibility based on her inconsistent identifications.

In my view, this evidence, the admission of which the defendant does not challenge on this appeal, is just as "prejudicial," but not unfairly so, as the evidence of his prior conviction for murder. I can see little difference between the jury learning that the defendant was a "killer" who had served time in Somers and the jury learning that the defendant had been convicted of murder on a prior occasion. Thus, in the context of this case, the functional equivalent of the challenged evidence was introduced without objection.

Furthermore, when the evidence of the defendant's prior conviction was introduced, the trial court gave a thorough cautionary instruction.[19] Neither the

---

[18] Furthermore, her testimony in this regard was corroborated by Detective Leroy Dease of the New Haven police department. Dease testified to Harris' two different identifications, and to her explanation that her first, untruthful identification was because "she was afraid."

[19] The trial court instructed the jury as follows: "Ladies and gentlemen . . . I wanted to indicate to you at this time the purpose for which that evidence that you just heard . . . and the exhibits which I don't think you've seen as yet, but you will eventually . . . the purpose for which they were offered. Now, you will recall that just before we started the evidence yester-

majority nor the defendant takes issue with the propriety of this instruction. In addition, in my view, the state's evidence of identification, although not overwhelming, was strong,[20] and the defendant's only evidence in response was the absence of fingerprint identification.

---

day morning I explained in very brief summation what the crime of capital felony means and I told you that capital felony is the crime that is charged when it is the . . . underlying claim of the state that the defendant with intent to cause the death of another person caused the death in this case of Wayne Curtis . . . and then I told you an additional element in connection with that charge is that in an unrelated case the defendant previously [had] been convicted of . . . murder. The evidence you just heard was evidence offered by the State in an effort to prove that last element I mentioned, that the defendant had previously been convicted of . . . murder, that was the purpose for which that evidence was offered, solely to prove that it did happen. That is the claim of the state. I want to stress that that evidence isn't to be considered by the jury along the lines of, well, if he did it once he did it again. That is not the purpose for which that evidence is offered. It isn't to be considered by you in that light. It is to be considered by you solely as evidence offered by the State in an effort to prove that this defendant was convicted, previously convicted of . . . murder according to the offer sometime in 1976. Now, that is the sole purpose of the offer. You are not to take it as meaning that, well, if he was convicted in 1976 he is a bad person, and he must have done it again, or anything like that. It is limited solely to prove one of the elements of capital felony, it is that element which distinguishes murder from capital felony . . . ."

[20] In addition to the evidence recited by the majority, there was additional identification evidence offered at the defendant's trial. As the majority notes, Bonaventura Console positively identified the defendant as the person whom he saw walking toward the victim's automobile moments before the shooting. Console, who lived in the neighborhood, saw the defendant as the defendant approached the victim's car shortly before the shooting. Console also testified that he "would see [the defendant] routinely three or four times a week" in the neighborhood. Thus, in Console the state presented a witness who had no obvious impeaching characteristics, and who saw the defendant walk toward the victim's car immediately before the shooting.

Shortly after the shooting, Nilda Mercado, the twelve year old girl who had witnessed the shooting, described the shooter to Patrol Officer Andrew Faggio as a black male, with braided hair, wearing a green army jacket, and as someone whom she recognized from the neighborhood. This testimony, which was admitted on the basis of the excited utterance exception

In sum, therefore, the functional equivalent of the challenged evidence was admitted at the trial irrespective of any bifurcation, the evidence against the defend-

to the hearsay rule, was in addition to the tape and transcript of her statement at the New Haven police station, which was also introduced under that exception without objection by the defendant.

Rosalie Mongillo had worked for thirty years at the Tip Top Quality Market, which was owned by her husband, and was located on Kimberly Avenue. She testified that the defendant had frequented the market almost daily for approximately three weeks prior to the slaying, that he always ordered a "roast beef sub," that he was normally dressed in camouflage fatigues and wore his hair in four braids "just like [he had] them now," and that he was the only person whom she had seen for approximately one year prior to the slaying "who had that combination of camouflage and braids in his hair in Kimberly Square." She specifically recalled him as very neat, quiet, carrying books as though he was going to college, and as conducting himself as "a gentleman."

Finally, the majority misconstrues the evidence when it states that Larry Hodge "retracted . . . before the jury" his earlier identification of the defendant as the person whom he had seen enter the victim's vehicle earlier that morning. Although while on the stand Hodge did not positively identify the defendant as the person he had seen enter the victim's vehicle, he did testify that the person he had seen enter the vehicle was "familiar" to him from "around the neighborhood," was wearing his hair in "braids [that] stood out," and looked "similar" to the defendant.

Furthermore, Hodge's prior, sworn statement to the police was introduced into evidence as substantive evidence, pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). In that statement, Hodge stated that: he had seen the man from a distance of fifteen to twenty feet; he had had a "good look" at him because the light from the streetlight illuminated his face; he knew the person involved as a black man whom he had previously seen in the neighborhood of the shooting and who wore braids; he had identified the defendant's photograph from a photographic array; and he had "no doubt" that the defendant was the person he had seen seated in the victim's vehicle. In addition, the photographic array from which Hodge had positively identified the defendant was introduced into evidence, and that photographic array presented a very fair selection of potential suspects bearing a physical resemblance to the defendant.

There was also other evidence that corroborated these identification witnesses, and that evidence came essentially from the defendant himself. When the defendant was arrested he was wearing a camouflage jacket that was labeled "[e]xtra small, regular" in size. As the state argued, the jury could determine, from his body type, that such a size jacket would not have been

ant was strong, and the court gave a thorough caution-
ary instruction. I conclude, therefore, that the trial
court did not abuse its discretion in denying his motion
to bifurcate, because, under all of the circumstances
of the case, the defendant was sufficiently protected
against the risk of unfair prejudice resulting from any
improper use by the jury of the evidence of his prior
conviction. I would, therefore, affirm the judgment of
the trial court.

---

appropriate for him to wear. Thus, this evidence corroborated Harris' tes-
timony that the defendant had discarded the jacket he had been wearing
at the time of the shooting.

Furthermore, Officer Brendan Cannon of the New Haven police depart-
ment testified that, on the night of October 19, 1990, while on patrol in
the Kimberly Square area, he saw the defendant, who fit the description
of someone wanted for the murder two nights before, namely, a black male
with his hair in four braids, and wearing a camouflage jacket. As Cannon
approached him, and before Cannon had said anything to him, the defend-
ant stated to Cannon: "I'm not the person you're looking for." At that point,
Cannon arrested the defendant, not for the murder, but on an outstanding
warrant for breach of the peace. Thus, the defendant's spontaneous claim
of innocence of a crime for which he had not yet been apprehended or ques-
tioned and his appearance corroborated the testimony of the state's wit-
nesses identifying him as the murderer.

In addition, after the defendant was arrested for this murder, he gave
an oral statement to the police after waiving his *Miranda* rights. See
*Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
In that statement, the defendant stated that he had been ill at home with
his girlfriend the entire evening of October 16-17, 1990, that on October
17, his girlfriend went to work at 7 a.m. and he stayed in bed until 9:30
a.m., and that he stayed at home or in close proximity thereto until 6 p.m.
He also stated that he frequently walked through the neighborhood of the
shooting, and that he wore "Army fatigue uniforms" 90 percent of the time.
Thus, his statement corroborated the testimony of the various identifica-
tion witnesses in two ways. First, as the trial court instructed the jury,
if the jury believed that his statement to the police regarding his where-
abouts at the time of the murder was false, the jury could consider that
as "evidence of guilty consciousness." Second, his statement corroborated
the testimony of the state's witnesses that he frequented the neighborhood
wearing camouflage clothing.