## STATE OF CONNECTICUT *v.* JERRY THOMPSON
## (AC 22724)

Lavery, C. J., and West and Cretella, Js.

---

Argued September 15, 2003—officially released January 27, 2004

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *James E. Thomas*, state's attorney, and, on the brief, *Robin Cutuli*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Jerry Thompson, appeals from the judgment of conviction, rendered after a jury trial, of assault in the second degree in violation of General Statutes § 53a-60 (a) (3) and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). On appeal, the defendant claims that the court improperly (1) admitted into evidence certain out-of-court identifications, (2) denied his motions to dismiss and for a mistrial on the ground of late disclosure of information by the state, (3) marshaled evidence during its charge to the jury and (4) denied his motion to sever or, in the alternative, to bifurcate the charge of criminal possession of a firearm from the assault charge. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On June 15, 2000, the victim, Wesley Gray, was playing basketball in Ramon Quiros Park in Hartford. The victim observed a red vehicle circling the area. After several men exited the vehicle, the driver parked it behind some bushes. The victim observed that the men were wearing dark colored sweatshirts, but he did not know any of them and did not speak to them.

The victim stopped playing basketball to speak with an individual whom he knew only as "Ro Dog." After

"blanking out" for a moment, the victim awoke to find himself lying on the ground. He felt a burning sensation in his body, but could no longer feel his legs. Several firefighters from a nearby fire station arrived and provided first aid to the victim, who subsequently was taken by ambulance to a hospital for treatment. The victim suffered from various gunshot wounds and, as a result of a shotgun pellet fragment in his spine, lost the use of his legs.

Marty Miller, an officer with the Hartford police department, arrived at the park, found the victim lying on the ground and observed at least one gunshot wound. Miller assisted the victim and accompanied him to the hospital, where he seized a shotgun pellet that had been removed from the victim's body, as well as articles of clothing worn by the victim.

Edwin Diaz, a firefighter with the Hartford fire department, after hearing gunshots, went to the rear of the fire station to investigate. He observed the defendant carrying a shotgun. Diaz ducked behind a car and retreated back to the fire station. He continued to observe the defendant through a window. Diaz again went outside and watched the defendant, who no longer was carrying the shotgun, from a distance of fifteen to twenty feet. The defendant climbed a fence and fled while Diaz and Lieutenant Miguel Sanchez, another firefighter, remained to secure the discarded shotgun. Sanchez also had observed the defendant in the rear of the station carrying the shotgun.

Steven Pileski, a Hartford police officer, was dispatched to the area and received information from various firefighters that the defendant was running through a field. Pileski began to search and observed the defendant fleeing, wearing a blue hooded sweatshirt. Pileski relayed that information and his location to other offi-

cers and commenced pursuit. Pileski soon lost sight of the defendant.

Brian Foley, a Hartford police officer, also was dispatched to the scene and began searching for the defendant. Foley heard a broadcast of Pileski's description of the defendant and saw a silhouette of a body in the bushes. As he approached the bushes, the defendant fled. Foley pursued the defendant until he was apprehended by other officers. Foley then returned to the bushes and found the blue sweatshirt that had been discarded by the defendant. Edward Foster, a Hartford police officer, also responded to the scene and, on the basis of Pileski's radio broadcast, began searching for the defendant. He followed the defendant into a dead-end alley and placed him in custody.

The defendant was charged with assault in the first degree and criminal possession of a firearm.[1] The jury convicted the defendant of the lesser included offense of assault in the second degree and criminal possession of a firearm. The court sentenced the defendant to an effective term of eight years incarceration and two years of special parole. This appeal followed.

I

The defendant's first claim is that the court improperly admitted into evidence certain out-of-court identifications of him. Specifically, the defendant argues that the identifications by Diaz and Sanchez were made as a result of an unnecessarily suggestive procedure and were unreliable under the totality of the circumstances. The state concedes that the identifications were unnecessarily suggestive, but argues that the identifications were reliable under the totality of the circumstances. We agree with the state.

---

[1] The state on November 9, 2001, withdrew the charge of conspiracy to commit assault in the second degree.

At the outset, we set forth the relevant legal principles and standard of review that guide our review of that issue. "Upon review of a trial court's denial of a motion to suppress, [t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. . . . [W]e will reverse the trial court's ruling [on evidence] only where there is abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error. . . . Because the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Salmon*, 66 Conn. App. 131, 135, 783 A.2d 1193 (2001), cert. denied, 259 Conn. 908, 789 A.2d 997 (2002).

"[T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . .

"An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the

resulting identification was unreliable." (Citation omitted; internal quotation marks omitted.) *State* v. *Colon*, 70 Conn. App. 707, 720–21, 799 A.2d 317, cert. denied, 261 Conn. 933, 806 A.2d 1067 (2002).

"The reliability of an identification procedure is considered under various factors, such as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [his] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, 61 Conn. App. 621, 631, 767 A.2d 137, cert. denied, 255 Conn. 951, 770 A.2d 31 (2001); see also *State* v. *Davis*, 198 Conn. 680, 683–84, 504 A.2d 1372 (1986). Put another way, "[r]eliability is the linchpin in determining the admissibility of the identification testimony . . . ." (Internal quotation marks omitted.) *State* v. *Jackson*, 73 Conn. App. 338, 382, 808 A.2d 388, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002). With the foregoing principles in mind, we address each of the challenged identifications in turn.

## A

### Edwin Diaz

The following additional facts are necessary for the resolution of the defendant's claim. On June 14, 2001, the defendant filed a motion to suppress the identification testimony. An evidentiary hearing was held on October 15, 2001, outside the presence of the jury.

At the hearing, Diaz testified that after he had arrived at the fire station on June 15, 2000, he heard gunshots and proceeded to the rear of the building. There was

still daylight at that time. He observed "a young black male, slender in build" wearing "dark colored clothing." That person was carrying a shotgun. Diaz stated that he got a "quick glance" at the individual's face. Diaz retreated to the kitchen in the fire station. The kitchen faced the rear of the building, so Diaz was able to observe the individual through a window. Diaz then proceeded to go back outside and observe the individual as he came toward him. Diaz ducked behind a car and when he looked back, the individual was climbing a fence without the shotgun.

Diaz proceeded to secure the shotgun and turned it over to a police officer. He also provided the police officer with a general description of the individual who had been carrying the shotgun. Later that evening, a police officer arrived at the fire station and requested that Diaz make an identification on what was "probably the shooter." Diaz got into the backseat of a police vehicle and was driven to the location where the officers had apprehended the defendant. The officers directed spotlights and headlights on the defendant as he was removed from the backseat of another police vehicle. Diaz identified the defendant as the person he had observed behind the fire station with a shotgun. Although he was "absolutely certain" on June 15, 2000, that the person he identified in custody was the same person that he had observed behind the fire station, Diaz was not absolutely certain of his identification at the hearing.

Carlos Torres, a Hartford police officer, also testified at the hearing. Torres transported Diaz from the fire station to the location where the individual had been apprehended. Torres testified that he never suggested that the individual in custody was the same person that Diaz had seen behind the fire station. He told Diaz that "[w]e believe we have the person. We need you to [identify] him."

The court, in ruling on the defendant's motion, agreed that the procedure used was "highly and unnecessarily suggestive . . . ." In examining the totality of the circumstances, the court, stating that "it's a close call," determined that the identification was sufficiently reliable to submit for the jury's consideration. Specifically, it stated that Diaz had multiple opportunities in daylight to observe the individual with a "good, hard look." Although his description was general and not specific, the court also found that the identification occurred less than two hours after Diaz observed him behind the firehouse. Finally, the court observed that Diaz was very certain of his identification.

Both this court and our Supreme Court have stated that "a one-to-one confrontation between a [victim] and the suspect presented to him for identification is inherently and significantly suggestive because it conveys the message to the [victim] that the police believe the suspect is guilty." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 61 Conn. App. 629–30; see also *State* v. *Austin*, 244 Conn. 226, 247, 710 A.2d 732 (1998). We have recognized, however, that "[i]t has been held repeatedly . . . that one man confrontations do not per se constitute a denial of due process of law." *State* v. *DeJesus*, 7 Conn. App. 309, 315, 508 A.2d 463 (1986). In the present case, a one-to-one confrontation between Diaz and the defendant occurred. The state does not dispute that under those circumstances, the identification was unnecessarily suggestive. We must, therefore, determine if the court properly found that the identification nevertheless was reliable under the totality of the circumstances.

On appeal, the defendant argues that only two factors favored a finding of a reliable identification, namely, the level of Diaz's certainty, and the short time between the observation and the identification. The defendant further argues that the remaining three factors, the

accuracy of Diaz's description, Diaz's opportunity to observe the suspect and the degree of Diaz's attention all weighed in favor of determining that the identification was unreliable. We disagree with the defendant.

The court heard evidence that Diaz had three opportunities to observe the defendant. First, he saw the defendant behind the fire station carrying a shotgun and was about twenty feet away from the defendant. Second, Diaz observed the defendant through a window. Third, Diaz watched the defendant climb over a fence. Each occurred in daylight so that the light conditions were favorable for an identification. The court found that Diaz got a "good, hard look" at the defendant as a result of the multiple opportunities to observe him. Our Supreme Court has stated that "*a good hard look will pass muster even if it occurs during a fleeting glance.*" (Emphasis added.) *State* v. *Ledbetter*, 185 Conn. 607, 615, 441 A.2d 595 (1981), citing *Coleman* v. *Alabama*, 399 U.S. 1, 4–6, 90 S. Ct. 1999, 26 L. Ed. 2d 387 (1970). Furthermore, we have recognized that "[a] view of even a few seconds may be sufficient for a witness to make an identification." *Williams* v. *Bronson*, 21 Conn. App. 260, 265, 573 A.2d 330 (1990).

The court also found that the time between the three sightings and the identification was relatively brief, less than two hours. Our Supreme Court has noted that such a short amount of time between observation and identification favors reliability. *State* v. *Hamele*, 188 Conn. 372, 378–79, 449 A.2d 1020 (1982); see also *State* v. *Rivera*, 74 Conn. App. 129, 148, 810 A.2d 824 (2002) (three and one-half weeks between crime, identification not so protracted to render identification unreliable).

Finally, Diaz indicated a high level of certainty of the accuracy of his identification. He stated that he was "absolutely certain" of the identification. The court, looking at the totality of the circumstances, compared

those factors to the unnecessarily suggestive procedure used and concluded that the identification was in fact reliable. On the basis of those facts, we cannot say that the court abused its discretion. Accordingly, we conclude that the court properly denied the motion to suppress and did not violate the defendant's constitutional rights.

## B

### Miguel Sanchez

The defendant also claims that the court improperly admitted into evidence the out-of-court identification by Sanchez, another firefighter. The following additional facts and procedural history are necessary for the resolution of that claim. At trial, the defendant filed a motion to suppress the out-of-court identification by Sanchez, and a hearing was held outside the presence of the jury. Sanchez testified that on June 15, 2000, he heard a popping noise, which he quickly determined to be a gunshot. He ran through the back door of the fire station and encountered a black man who was carrying a firearm. He observed the individual from a distance of approximately twenty to twenty-five feet during daylight hours. He stated that he "exchanged vision" for five to ten seconds with the person carrying the firearm. He then retreated to the door of the fire station but did not go inside. He turned to face the individual, who was no longer carrying the firearm and was starting to climb a fence. Sanchez noticed that this individual was wearing an oversized white T-shirt underneath a dark colored sweatsuit.

Sanchez was taken to the site where the defendant had been apprehended. That occurred approximately one hour after Sanchez had observed the individual behind the fire station. Sanchez stated that he had "no problem" identifying the defendant, whom the police

had in custody, as the person he saw behind the fire station.[2]

The court denied the defendant's motion "essentially for the same reasons" that it denied the motion to suppress Diaz's identification. The court again noted that although the procedure was highly and unnecessarily suggestive, it was reliable nevertheless. Specifically, the court, in reviewing the factors to establish reliability, stated that Sanchez had the opportunity to have eye to eye contact with the defendant for five to ten seconds, during which Sanchez focused on the defendant's face. Sanchez also provided a detailed description of the clothing worn by the defendant, specifically the sweatsuit and oversized white T-shirt. The identification occurred approximately one hour after the observation, and Sanchez demonstrated a high level of certainty with his identification.

On the basis of the principles set forth in part I A and the cases cited therein, we conclude that the court did not abuse its discretion when it determined that the identification made by Sanchez was reliable. Accordingly, it was not improper for the court to deny the defendant's motion to suppress.

## II

The defendant next claims that the court improperly denied his motions to dismiss and for a mistrial, which he filed on the ground of late disclosure of information by the state. Specifically, the defendant argues that he was prevented from presenting a claim of self-defense, and denied due process of law and a fair trial because the state, after jury selection and the testimony of several witnesses, disclosed the police report of an eyewitness to the shooting. We are not persuaded.

---

[2] Sanchez also stated that he was not able to make a specific identification at the time of trial.

The following additional facts and procedural history are necessary for the resolution of that claim. After the jury had been selected and began hearing testimony, the defendant filed a motion for a mistrial and to dismiss. A hearing on the motion was held on October 22, 2001. The basis for the motion was that the Hartford police department[3] had withheld information from the defendant.[4] Once the prosecutor learned of the existence of the withheld material, she immediately turned it over to the defendant.

The withheld material consisted of a police interview with a witness, Eric Ash, who had been in the park at the time of the shooting. Ash told the officers that the victim was a drug dealer who had been involved in a dispute with an individual named "Bubba" over the sale of drugs in the area of the park. Ash also placed the victim at a different location in the park at the time of the shooting. The defendant claimed that this interview was exculpatory because it contradicted the victim's testimony and demonstrated a motive for the victim to fabricate his testimony. The defendant also argued that Ash's account of the shooting explained the presence of the .45 caliber shell casings that had been found in the park. Ash's statements supported the defendant's claim that he fired the shotgun in self-defense.

---

[3] "It should also be noted that the fact that the [nondisclosed material] was in the possession of the . . . police department and not of the state's attorney does not detract from the state's duty to have disclosed it in this case. Police are treated as an arm of the prosecution for [*Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] purposes, and the taint on the trial is no less if they, rather than the state's attorney, were guilty of the nondisclosure. . . . The State's duty of disclosure is imposed not only upon its prosecutor, but also on the State as a whole, including its investigative agencies. Therefore, if the [material was] held by the . . . police department we would be compelled to conclude that, constructively, the State's attorney had both access to and control over the documents." (Citations omitted; internal quotation marks omitted.) *Demers* v. *State*, 209 Conn. 143, 153, 547 A.2d 28 (1988).

[4] The defendant had filed requests for discovery on June 14 and October 2, 2001.

Defense counsel argued that he was not able to investigate properly the defendant's self-defense claim. Furthermore, defense counsel stated that he would have undertaken a different trial strategy and would have made additional inquiries during voir dire and plea negotiations.

The court denied the defendant's motion. It noted that the defendant, if he had acted in self-defense, would necessarily know that and, therefore, Ash's statements did not reveal any new information. Thus, the defendant was not precluded from asking questions regarding self-defense during voir dire. The court, as a remedy to cure the late disclosure, granted the defendant's request for a continuance and offered the defendant the opportunity to recall witnesses for further examination.

During his testimony before the jury, Ash identified as the defendant the individual he knew as "Bubba." On the day the victim was shot, Ash went to the park to purchase some drugs. He testified that he had observed the defendant get a weapon from a red vehicle. Ash turned and ran from the park. As he was running, Ash heard gunshots, but he did not see who fired them.

On appeal, the defendant claims that the material was not disclosed in a timely manner for effective use at trial. Specifically, he reasserts the claims that certain decisions regarding trial strategy and cross-examination were irrevocably made and that, therefore, the defendant was permanently prejudiced. The defendant also argues that he selected the jury without the ability to conduct an adequate voir dire.

"We begin with the pertinent standard, outlined by [*Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] and its progeny, by which we determine whether the state's failure to disclose evidence has violated a defendant's constitutional rights. In [*Brady* v. *Maryland*, supra, 87], the United States Supreme Court

held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 452, 758 A.2d 824 (2000).

It is well established that "[e]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*." (Internal quotation marks omitted.) *State* v. *Reddick*, 197 Conn. 115, 121, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). Furthermore, we have stated: "*Brady* does not mandate pretrial disclosure in all cases. W. LaFave & J. Israel, Criminal Procedure (2d Ed. 1992) § 20.7, p. 894. . . . Where there has been an initial disclosure of exculpatory evidence at trial, the appropriate standard to be applied is whether the disclosure came so late as to prevent the defendant from receiving a fair trial. . . . The defendant bears the burden of proving that he was prejudiced by the failure of the state to make the disclosure earlier." (Citations omitted; internal quotation marks omitted.) *State* v. *Hayles*, 52 Conn. App. 564, 567–68, 727 A.2d 762, cert. denied, 249 Conn. 903, 732 A.2d 776 (1999).

With respect to the defendant's claims regarding trial strategy and cross-examination, we conclude that the information contained in the police interview of Ash was disclosed during the trial and therefore was not suppressed under *Brady*. Furthermore, we note that the court, in an effort to ensure a fair trial, offered the defendant as much time for a continuance, within

reason, that he needed to review the new information. The court also informed the defendant that he would be permitted to recall any witness for further cross-examination. There is no denial of due process if the disclosed material can be utilized effectively at trial, and the defendant bears the burden of proving that he has been prejudiced by the late disclosure. *State* v. *Sinchak*, 47 Conn. App. 134, 142, 703 A.2d 790 (1997), appeal dismissed, 247 Conn. 440, 721 A.2d 1193 (1999); see also *State* v. *Morrill*, 42 Conn. App. 669, 677–78, 681 A.2d 369 (1996). We conclude, therefore, that with respect to the claims regarding trial strategy and cross-examination, the defendant has failed to establish a *Brady* violation or that he was prejudiced by the late disclosure.

The defendant also claims that due to the late disclosure by the state, he was unable to examine potential jurors properly during voir dire. Specifically, the defendant argues that he would have made inquiries regarding the doctrine of self-defense had he known about Ash. According to the defendant, Ash's statements to the police supported the defendant's claim of self-defense.

We note that "[t]he unmistakable tone of *Brady* is that evidence required to be disclosed must be disclosed at a time when it can be used." (Internal quotation marks omitted.) *State* v. *William C.*, 71 Conn. App. 47, 57, 801 A.2d 823, cert. granted on other grounds, 262 Conn. 907, 810 A.2d 277 (2002); see also *State* v. *Pollitt*, 199 Conn. 399, 414, 508 A.2d 1 (1986). The defendant contends that the disclosure, made after the jury had been selected, prevented him from using Ash's statements because the defendant could not question the jury about the doctrine of self-defense.

We do not believe that the defendant was prejudiced. The defendant himself would have known if he fired the

shotgun in self-defense. We also note that the defendant was aware of the presence of .45 caliber shell casings found near the shooting. The defendant was aware of a potential claim of self-defense absent any corroboration by Ash. The defendant, therefore, had the opportunity to ask questions during voir dire regarding a potential claim of self-defense, but chose not to ask such questions. We by no means endorse or approve of the late disclosure, but we cannot conclude that the defendant was prejudiced by the delay.

## III

The defendant next claims that the court improperly marshaled evidence during its charge to the jury. Specifically, the defendant argues that the court, during its charge to the jury, only presented the state's evidence regarding the claim of self-defense and excluded any discussion of the evidence that supported such a claim. The defendant contends that as a result of that improper marshaling, he was denied a fair trial. We disagree.

The following additional facts and procedural history are necessary for the resolution of that issue. During its charge to the jury, the court explained the law regarding self-defense and included four circumstances that would preclude the jury from finding that the defendant was not justified in the use of deadly physical force.[5] The court also commented on the evidence regarding the claim of self-defense. The defendant claims on appeal that the court's comments favored only the state

---

[5] The court first provided a detailed description of the doctrine of self-defense. The court then proceeded to explain the four circumstances in which the defendant would not have been justified in using deadly physical force. Specifically, they were (1) if the defendant did not reasonably believe that the victim was about to use deadly physical force or was about to inflict great bodily harm on the defendant; (2) if the defendant knew he could retreat with complete safety; (3) if the defendant was the initial aggressor and did not withdraw; and (4) if the defendant and the victim mutually had agreed to engage in combat.

and excluded his evidence.[6] The defendant did not object to the court's charge and now seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error "only if *all* of the following conditions are met: (1) the record is adequate to review the claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. We agree with the defendant that the record is adequate for review and that the claim is of constitutional magnitude, so we must determine whether the alleged constitutional violation clearly exists.

---

[6] The specific portion of the charge that the defendant argues was improper states: "I've already mentioned some of the evidence . . . relevant to this claim of self-defense. Evidence presented by the state to prove that the defendant did not reasonably believe that [the victim] was about to use deadly physical force against him and that it was necessary for the defendant to use that degree of force to repel [the victim] included the evidence that the gun that the defendant had was a shotgun and the shotgun wounds that [the victim] suffered were in his back; that is, evidence that the defendant shot [the victim] as [the victim] was running away from him, not threatening him. A person is not justified in using deadly physical force upon another person if he knows he can avoid the necessity of using such force with complete safety by retreating. . . . On this point, the state presented the testimony of [Ash] to the effect that after arguing with [the victim], the defendant left him and went to a van and brought out a large gun. This evidence would permit the inference that the defendant could have simply kept going and thereby avoid[ed] the shooting altogether.

"A person is not justified in using deadly physical force if he is the initial aggressor and does not withdraw from the encounter. . . . Again, evidence presented in this—by the state on this point included Ash's testimony that he saw the defendant go to the van and retrieve a gun, that he later heard shots and evidence that [the victim] was shot in the back.

"Fourth, a person is not justified in using deadly physical force against another person if the encounter between them was combat in which one of them agreed to engage. . . . And evidence presented by the state on the point was essentially the same as discussed as above."

This court has stated: "A trial court has broad discretion to comment on the evidence adduced in a criminal trial. . . . A trial court often has not only the right, but also the duty to comment on the evidence. . . . The purpose of marshaling the evidence, a more elaborate manner of judicial commentary, is to provide a fair summary of the evidence, and nothing more; to attain that purpose, the [trial] judge must show strict impartiality. . . . To avoid the danger of improper influence on the jury, a recitation of the evidence should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention. . . .

"On review, we do not evaluate the court's marshaling of the evidence in isolation. Rather, [t]o determine whether the court's instructions were improper, we review the entire charge to determine if, taken as a whole, the charge adequately guided the jury to a correct verdict. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Citation omitted; internal quotation marks omitted.) *State* v. *Dixon*, 62 Conn. App. 643, 647–48, 772 A.2d 166 (2001).

We have reviewed the charge in its entirety and conclude that although the court provided more details regarding the state's evidence with respect to the defendant's self-defense claim, it fairly summarized the defendant's theory of self-defense.[7] We note that at the outset

[7] The court stated that "[i]n this case, there was evidence that raises the issue of whether the defendant was justified in shooting [the victim]. This includes testimony that the defendant and [the victim], also known as Little Red, were arguing before [the victim] was shot, that [the victim] and some

of its charge, the court stated: "I will be referring to some of the evidence during these instructions and, when I do, it's simply for the purpose of illustration and clarification. I don't intend to limit your consideration to the evidence that I might mention. And if, in your opinion, I incorrectly describe any of the evidence, you must correct my mistake. Because it's your responsibility to review the evidence and determine the facts established by it."

Additionally, the state, which had the burden of disproving the defendant's claim of self-defense beyond a reasonable doubt, produced more evidence at trial. Our Supreme Court has recognized that "[o]ne obvious reason more time was spent in marshalling the state's evidence is simply that there was more of it. . . . [T]he nature and extent of the trial court's comments . . . largely depend on the facts involved in a particular case and the manner in which it has been tried." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 255 Conn. 782, 798–99, 772 A.2d 559 (2001).

After reviewing the charge in its entirety, we conclude that the court did not marshal the evidence so as to unduly prejudice the defendant or deprive him of his right to a fair trial. Accordingly, the defendant's claim fails under the third prong of *Golding*.

## IV

The defendant's final claim is that the court improperly denied his motion to sever or, in the alternative, to bifurcate the charge of criminal possession of a firearm from the assault charge. Specifically, the defendant claims that he was denied a fair trial because he was

companions were armed with handguns and that empty shell casings of shells fired from a handgun or handguns were found at the scene. In essence, without admitting that he shot [the victim], the defendant contends that if you determine that he did shoot [the victim], he was acting in self-defense and was, therefore, legally justified."

forced to stipulate that he previously had been con-
victed of a felony, as proof of a prior felony conviction
is a required element for a conviction of criminal posses-
sion of a firearm. We disagree.

The following additional facts and procedural history
are necessary for the resolution of that claim. Prior to
the start of jury selection, the defendant filed a motion
for severance of the criminal possession of a firearm
count. The defendant also suggested, as an alternative,
that the court bifurcate the charge of the criminal pos-
session of a firearm from the assault charge. The court
denied the defendant's motion. The defendant renewed
his objection at trial outside the presence of the jury,
but the court again denied the motion.

"Our rules of practice allow a trial court to order,
sua sponte or upon motion of the defendant, a separate
trial of two offenses if it appears that the defendant is
prejudiced by the joinder of the offenses. See Practice
Book § 41-18 . . . . The question of severance lies
within the discretion of the trial court. We will not
disturb the trial court's conclusion on the issue absent
a clear abuse of discretion. The discretion to sever a trial
should be exercised only if a joint trial will substantially
prejudice the defendant. Substantial prejudice is more
than disadvantage and the formidable task of demon-
strating an abuse of discretion and that a joint trial
resulted in substantial prejudice falls to the defendant.
. . . Simply put, the test to be applied is whether sub-
stantial injustice will result if the charges are tried
together." (Citations omitted; internal quotation marks
omitted.) *State* v. *Davis*, 51 Conn. App. 171, 180–81,
721 A.2d 146 (1998).

In our view, this court's decision in *State* v. *Banta*,
15 Conn. App. 161, 544 A.2d 1226, cert. denied, 209
Conn. 815, 550 A.2d 1086 (1988), controls the resolution
of the issue. In *Banta*, the defendant was convicted of

robbery in the first degree and criminal possession of a pistol. Id., 163. The defendant appealed from his conviction, claiming, inter alia, that the trial court improperly had denied his motion to sever the charges and improperly denied his motion to bifurcate the charges. Id. Essentially, the defendant asserted that he was substantially prejudiced by the admission of the prior felony conviction. We disagreed and set forth five factors for the evaluation of substantial prejudice to the defendant: (1) the manner in which the evidence entered the case, and the jury's knowledge of the facts and circumstances of the underlying felony conviction, (2) the adequacy of cautionary instructions set forth by the court, (3) the use by the state of the prior felony conviction, (4) the likelihood that the prior felony conviction will inflame the passions of the jury in light of the nature of the offenses charged and (5) the strength of the evidence against the defendant. Id., 170–71; see also *State* v. *Taylor*, 52 Conn. App. 790, 794, 729 A.2d 226 (1999); *State* v. *Davis*, supra, 51 Conn. App. 181–82. We will, therefore, analyze the defendant's claim in light of those factors.

The first factor requires the consideration of the manner in which the evidence of the defendant's prior felony conviction was entered and how much detail the jury received with respect to that conviction. Just prior to the conclusion of the state's case, the following stipulation was read to the jury. "You'll remember that among the charges brought against the defendant is one which is called the crime of criminal possession of a firearm. And that is a violation of § 53a-217 . . . . And you'll also remember that I think just before the trial started, I read to you the text of the statutes that the defendant was accused of violating. And that statute reads as follows: A person is guilty of criminal possession of a firearm when such person possesses a firearm and has been convicted of a felony.

"Now, in this case, at this point, the defendant and the state, that is, through their attorneys, have agreed to make a particular stipulation, that is, a statement that you can consider as a fact. And you'll have it with you. And the stipulation reads as follows: The state of Connecticut through its counsel, and the defendant . . . through his counsel, stipulate that the defendant has previously been convicted of a felony. So, that you can accept as a fact proved."

The jury was not informed of any of the details regarding the defendant's underlying conviction. We have held that informing the jury of the name or the class of the felony does not weigh in favor of substantial prejudice to the defendant. See *State* v. *Taylor*, supra, 52 Conn. App. 791 (jury told defendant had been convicted of larceny in second degree, a class C felony); *State* v. *Davis*, supra, 51 Conn. App. 182 (jury told defendant had been convicted of class B felony). In the present case, the jury was given less information regarding the underlying felony conviction than the juries in *Taylor* and *Davis*. That factor, therefore, does not weigh in the defendant's favor.

The second factor concerns the adequacy of the cautionary instructions, if any, given by the court. Our review of the record reveals that the court provided ample cautionary instructions. At the time the stipulation was read to the jury, the court stated: "This stipulation and that fact is admitted only in relation to that one count of criminal possession of a firearm, and it's admitted only to prove that one necessary element of that crime, namely, that the defendant has been convicted of a felony. It is not admitted to prove any other element of that crime, that is to say that the defendant possessed the firearm or that he was at the scene at that time. The stipulation is admitted only to prove that the defendant was previously convicted of a felony.

"And, of course, the stipulation is not admitted to show that the defendant—to show or to prove any element of any other crime that the defendant is charged with. It's not admitted to show that the defendant has any propensity for committing crimes. It's not admitted to show that the previous felony conviction had any relation to any of the crimes charged in this case. And the state is not claiming that [the] previous conviction has any relation to any of the crimes charged in this case."

The court clearly provided a limiting instruction to the jury at the time of the stipulation. Therefore, that factor does not favor the defendant.

The third factor addresses the use of the prior felony conviction by the prosecutor during argument to the jury. During closing argument, the prosecutor made only a passing reference to the prior felony conviction. She stated: "The other element [of criminal possession of a firearm] doesn't need to be proved. You can take it as proven. There was a stipulation. The judge mentioned that earlier, that the defendant had previously been convicted of a felony." It is not likely that this brief, neutral comment would substantially prejudice the defendant and, accordingly, that factor does not favor him.

The fourth factor is whether the evidence of the prior felony conviction would likely inflame the passions of the jury in light of the nature of the offenses charged and thereby cause the defendant to be prejudiced. As we have stated, the jury was given no information regarding the underlying felony conviction. Although the stipulation may have been disadvantageous to the defendant, it was an element that necessarily had to be proven under § 53a-217. That factor also does not favor the defendant.

The fifth factor is the strength of the evidence against the defendant. In the present case, two firefighters identified the defendant as the person they observed behind the fire station carrying a firearm shortly after hearing a gunshot. At the time of the incident, they were both certain about their identifications. Moreover, there was evidence that the victim was shot with a shotgun, the type of weapon that the defendant was seen carrying. The defendant was observed fleeing the scene of the shooting and attempted to discard his clothing after hiding in some bushes. In addition, Ash saw the defendant at the park and watched him walk to the van and pull out a long gun. Ash left as the shooting started. Finally, we note that the victim identified the defendant as one of the men who exited the red vehicle just before the victim was shot. In sum, there "was neither sparse nor unconvincing" evidence against the defendant. See *State* v. *Banta*, supra, 15 Conn. App. 172. That factor, therefore, does not support the defendant's argument.

Applying the five factors to this case, we conclude that the court did not abuse its discretion in denying the defendant's motion to sever or to bifurcate the criminal possession of a firearm count.

The defendant contends that a more appropriate test for determining whether he was prejudiced substantially is found in our Supreme Court's decision in *State* v. *Jones*, 234 Conn. 324, 662 A.2d 1199 (1995).[8] We conclude that *Jones* is distinguishable and, therefore, the defendant's argument is without merit.

In *Jones*, the defendant, who previously had been convicted of felony murder, was charged, inter alia, with capital felony in violation of General Statutes § 53a-54b

---

[8] We note that a similar argument was rejected by this court in *State* v. *Joyce*, 45 Conn. App. 390, 404–405, 696 A.2d 993 (1997), appeal dismissed, 248 Conn. 669, 728 A.2d 1096 (1999).

(3).[9] *State* v. *Jones*, supra, 234 Conn. 326. The defendant was convicted and sentenced to life imprisonment without the possibility of parole. Id., 329–30. On appeal, the defendant claimed that the trial court should have bifurcated the charge of capital felony; specifically, the jury should have decided the issue of whether the defendant was guilty of the intentional murder of the victim as defined by General Statutes § 53a-54a.[10] *State* v. *Jones*, supra, 334. If convicted of murder, the defendant could then stand trial before the same jury to decide whether he was guilty of capital felony. Id. Our Supreme Court agreed with the defendant *"under the specific circumstances of [that] case . . . ."* (Emphasis added.) Id.

At the outset of its discussion, our Supreme Court stated that "if proof of a defendant's prior conviction is used to enhance the punishment for a contemporaneous conviction of a substantive offense, the state must file a two part information. . . . This procedure is used when the state charges a defendant as a persistent offender." (Citations omitted.) Id., 337–38.

The court then discussed our decision in *Banta.* "[The Appellate Court] recognized that the rules of practice require a two part information and trial when proof of a defendant's prior conviction is used to enhance the punishment for a contemporaneous conviction of a substantive offense, but held that these rules did not apply to a charge brought under § 53a-217. . . .

"This case presents a scenario very different from that of *Banta.* In this case, an information that alleged

---

[9] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony . . . ."

[10] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

only that the defendant had intentionally murdered the victim, without mention of the defendant's prior conviction, *would* allege a cognizable offense, namely, murder in violation of § 53a-54a. We agree that the structure of the capital felony statute, like that of the statute at issue in *Banta*, makes the former conviction an essential element of the crime charged. Compare General Statutes §§ 53a-54b (3) and 53a-40. The purpose of § 53a-54b (3), however, unlike the statute at issue in *Banta*, is not to define a new type of crime, but rather to enhance the sentence for an activity that is already classified as a crime. By designating the defendant's prior felony conviction as an element of the crime of capital felony, the legislature has made the defendant eligible for the sentence not just of life in prison, but of death. *Thus, the statute is much more analogous to the persistent offender statutes* we discussed in *State v. Ferrone*, [96 Conn. 160, 172–76, 113 A. 452 (1921)], *than to the crime of possession of a handgun by a felon* discussed in *Banta*." (Citations omitted; emphasis added; internal quotation marks omitted.) *State v. Jones*, supra, 234 Conn. 338–40.

The present case is further distinguished from *Jones* because *Jones* involved a conviction under the capital felony statute. "We do not demand or necessarily expect our trial courts to create new roads of practice and procedure never before traveled in our jurisdiction. Furthermore, *we recognize that, in the ordinary case, both the balancing of relevance and prejudice and the determination of joinder or bifurcation are committed to the sound exercise of discretion by the trial court. If this were an ordinary case, we would find no abuse of discretion by the trial court's rulings in this case.* Because of the high risk of prejudice to the defendant on the present record and the absence of any prejudice to the state, *combined with the extraordinary care required in appellate scrutiny of a capital felony con-*

*viction,* we conclude, however, that the risk that the defendant failed to receive a fair trial is so substantial that we will exercise our supervisory powers to order a new bifurcated trial for this defendant." (Emphasis added.) Id., 346.

We are not persuaded by the defendant's claim that *Jones* applies to the present case. In the present case, the defendant was charged with criminal possession of a firearm, which we have stated "is not a penalty enhancement statute." *State* v. *Joyce,* 45 Conn. App. 390, 405, 696 A.2d 993 (1997), appeal dismissed, 248 Conn. 669, 728 A.2d 1096 (1999). Furthermore, *Jones* involved the capital felony statute, which requires appellate courts to engage in extraordinary care and scrutiny of the record. *State* v. *Jones,* supra, 234 Conn. 346. We conclude, therefore, that the factors enunciated in *Banta* and its progeny are the proper test for determining whether the defendant has been substantially prejudiced by the admission of his prior felony conviction.

The defendant further argues that other jurisdictions have adopted severance or bifurcation as a per se rule and urges that this court, by way of its supervisory powers,[11] follow that "trend." We are not persuaded by that argument.

---

[11] "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under [our Supreme Court's] supervisory authority, [our Supreme Court has] adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. . . . [O]ur [Supreme Court's] supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of [court's] supervisory powers. See *State* v. *Hines,* 243 Conn. 796, 815, 709 A.2d 522 (1998) ([Supreme Court's] supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts); *State* v. *Coleman,* 242 Conn. 523, 540,

The defendant has cited cases from different jurisdictions that have held that a per se rule of severance or bifurcation is proper in these types of cases. For example, in *Chapple* v. *State*, 866 P.2d 1213, 1217 (Okla. Crim. App. 1993), the Oklahoma Court of Criminal Appeals, expressly overruling prior decisions, held that "[w]henever a defendant is charged with multiple counts, one or more which require a prior conviction as an element of the crime, and one or more which do not, trial shall be bifurcated." See also *United States* v. *Jones*, 16 F.3d 487, 492–93 (2d Cir. 1994) (District Court improperly failed to bifurcate charge of possession of firearm from other charges); *State* v. *McCraine*, 214 W. Va. 188, 588 S.E.2d 177 (2003) (holding that trial court must grant bifurcation in all jury cases). The defendant argues that those cases stand for a trend in this area of the law and that we should adopt that per se rule.

We disagree with the defendant's argument that there is a trend establishing a per se rule of severance or bifurcation. For example, in *United States* v. *Daniels*, 770 F.2d 1111 (D.C. Cir. 1985), the United States Court of Appeals for the District of Columbia Circuit, in rejecting such a rule, stated that the United States Courts of Appeal for "the Fourth, Sixth, Seventh and Tenth Circuits have all rejected the approach apparently taken in [establishing a per se rule of severance or bifurcation.] See *United States* v. *Silva*, 745 F.2d 840, 843 (4th Cir. 1984), cert. denied, 470 U.S. 1031, 105 S. Ct. 1404, 84 L. Ed. 2d 791 (1985); *United States* v. *Valentine*, 706

700 A.2d 14 (1997) ([Supreme Court previously has exercised its] supervisory powers to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole). . . . [E]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions." (Citations omitted; internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 61 n.26, 826 A.2d 1126 (2003).

F.2d 282, 290 (10th Cir. 1983); *United States* v. *Aleman,* 609 F.2d 298 (7th Cir. 1979), cert. denied, 445 U.S. 946, 100 S. Ct. 1345, 63 L. Ed. 2d 780 (1980); *United States* v. *Roe,* 495 F.2d 600 (10th Cir.), cert. denied, 419 U.S. 858, 95 S. Ct. 107, 42 L. Ed. 2d 92 (1974); *United States* v. *Lee,* 428 F.2d 917 (6th Cir. 1970), cert. denied, 404 U.S. 1017, 92 S. Ct. 679, 30 L. Ed. 2d 665 (1972). These courts reasoned that severance to avoid prejudice is a matter left to the trial judge's discretion, and that juries must be presumed to follow limiting instructions." *United States* v. *Daniels, supra,* 1117–18. The *Daniels* court rejected the defendant's invitation to fashion an absolute rule and instead left the resolution of those types of cases within the discretion of the trial court. Id., 1118.

As we have stated, this court repeatedly has endorsed and applied the factors set forth in *Banta.* See State v. *Hair,* 68 Conn. App. 695, 701–703, 792 A.2d 179, cert. denied, 260 Conn. 925, 797 A.2d 522 (2002); *State* v. *Abraham,* 64 Conn. App. 384, 397–400, 780 A.2d 223, cert. denied, 258 Conn. 917, 782 A.2d 1246 (2001); *State* v. *Taylor, supra,* 52 Conn. App. 794–96; *State* v. *Davis, supra,* 51 Conn. App. 180–84; *State* v. *Joyce, supra,* 45 Conn. App. 404–405. Additionally, we note that our Supreme Court, in *State* v. *Jones, supra,* 234 Conn. 324, did not overrule *Banta,* but instead distinguished that case.

"The doctrine [of stare decisis] requires a clear showing that an established rule is incorrect and harmful before it is abandoned . . . and counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Citation omitted; internal quotation marks omitted.) *State* v. *McElveen,* 261 Conn. 198, 212, 802 A.2d 74 (2002). Furthermore, "[s]tare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is

relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." (Citation omitted; internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 367–68 n.18, 796 A.2d 1118 (2002).

In the present case, we are not persuaded that the defendant has made a clear showing that the rule set forth in *Banta* was incorrect and harmful, and, therefore, we decline his invitation to overrule it.

The judgment is affirmed.

In this opinion the other judges concurred.